## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAUDEN BISEL, Individually and on Behalf All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>          v.<br><br>ACASTI PHARMA, INC., RODERICK CARTER, JAN D'ALVISE, JOHN CANAN, and DONALD OLDS<br><br><br>                          Defendants. | Case No. 1:21-cv-06051-KPF<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Lauden Bisel ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.     This is an action brought as a class action by Plaintiff on behalf of himself and the pre-Merger (as defined below) holders of the common stock of Acasti Pharma Inc. ("Acasti" or the "Company") (other than Defendants outlined below) against the Company and the members of the Company's board of directors (the "Board" or the "Individual Defendants" and, together with Acasti, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the merger between Acasti and Grace Therapeutics Inc. ("Grace") (the "Merger").

2.     On May 7, 2021, Acasti and Grace entered into an Agreement and Plan of Merger

(the "Merger Agreement"), pursuant to which Acasti would acquire Grace, with existing Acasti shareholders owning at least 55% and existing Grace stockholders owning at most 45% of the outstanding capital stock of the post-close combined company on a fully-diluted basis (the "Exchange Ratio"). In order to convince Acasti's public shareholders to vote in favor of the Merger, on July 15, 2021, Defendants authorized the filing of a proxy statement/prospectus with the SEC (the "Proxy"). While Defendants touted the fairness of the Merger to the Company's stockholders in the Proxy, they failed to disclose material financial information that was necessary for stockholders to properly assess the fairness of the Merger, thereby rendering certain statements in the Proxy materially incomplete and misleading in violation of Sections 14(a) and 20(a) of the Exchange Act.

3.      Rule 14a-9(a) prohibits proxy statements from: (i) containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact; and (ii) omitting any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.  17 C.F.R. § 240.14a-9(a).

4.      Defendants violated Section 14(a) by withholding critical financial projections for Grace, without which, it was impossible for Acasti shareholders to properly asses the fairness of the Merger.  This omission, in turn, rendered both the Proxy's summary of the valuation analyses performed by Acasti's financial advisor, Oppenheimer & Co., Inc. ("Oppenheimer") in support of its fairness opinion and the Board's recommendation in favor of the Merger materially misleading.

5.      The Acasti shareholder vote in connection with the Merger occurred on August 26, 2021. Notably, despite the fact that (a) there were 208,375,549 outstanding shares of Acasti

common stock entitled to vote on the Merger, (b) only 79,679,548 shares were actually present or represented, representing just 36.32% of all outstanding shares, and (c) even worse, only 21,915,935 shares were actually cast in favor of the Merger – such that the Merger was approved by a mere 10.5% of all outstanding shares.[1] What is more, Acasti's directors and executive officers cumulatively held approximately 3.9% of Acasti's outstanding shares, and the Proxy represented that Acasti expected those directors and executive officers to vote their shares in favor of the Merger. That means that, excluding these directors and executive officers, who were expected to vote in favor of the Merger, only 6.6% of the Company's non-insider, total outstanding shares voted in favor of the Merger. Acasti announced the close of the Merger the very next day on August 27, 2021.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

8.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this

---

[1]      This bizarre outcome is the result of Acasti's quorum and voting rules, pursuant to which a mere 33.33% of outstanding shares need be present to form a quorum; all common shares represented at an annual or special meeting, including broker non-votes and Acasti common shares that are represented but that abstain from voting, are treated as present and entitled to vote for purposes of determining the presence or absence of a quorum; and the approval of the Merger required just the affirmative vote of a majority of the votes cast on it at the special meeting.

District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

9.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's common shares trade on The Nasdaq Capital Market, which is headquartered in this District, and the Proxy was mailed into New York, where members of the Class undoubtedly reside. Furthermore, Acasti's agent for service, its proxy solicitor, its financial advisor in connection with the Merger, and  its outside counsel in connection with the Merger are all located in this District; Grace's outside counsel in connection with the Merger is located in this District; and the Merger Agreement specifically provides that the closing of the Merger would take place at the New York office of Acasti's outside counsel in connection with the Merger, which is located in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

10.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Acasti common stock.

11.      Defendant Acasti is a biopharmaceutical company incorporated in Québec, Canada with headquarters in Laval, Québec, Canada. Acasti's common stock trades on the Nasdaq and

the TSX Venture Exchange under the ticker symbol "ACST."

12.     Defendant Roderick Carter ("Carter") is, and has been at all relevant times, a director and Chairman of the Board of Acasti.

13.     Defendant Jan D'Alvise ("D'Alvise") is, and has been at all relevant times, a director, President and Chief Executive Officer of Acasti.

14.     Defendant John Canan ("Canan") is, and has been at all relevant times, a director of Acasti.

15.     Defendant Donald Olds ("Olds") is, and has been at all relevant times, a director of Acasti.

16.     Defendants identified in paragraphs 12 through 15 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

17.     Defendant D'Alvise signed the letter transmitting the Proxy and all four Individual Defendants signed the Proxy (though their agent, Defendant D'Alvise). Proxy, II-6.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Acasti harmed by Defendants' actions alleged herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

19.     This action is properly maintainable as a class action because:

        a.     The Class is so numerous that joinder of all members is impracticable. As of July 14, 2021 (the record date for the shareholder vote on the Merger), there were approximately 208,375,549 outstanding shares of Acasti common stock entitled to vote on

the Merger. The actual number of public shareholders of Acasti will be ascertained through discovery;

      b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

          i)     whether Defendants have misrepresented or omitted material information in the Proxy in violation of Section 14(a) of the Exchange Act;

          ii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

          iii)   the amount of damages the Class has suffered as a result of Defendants' unlawful conduct.

      c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

      d.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

      e.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

      f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought

herein with respect to the Class as a whole; and

g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

### I.    RELEVANT CORPORATE BACKGROUND

20.     Acasti is a biopharmaceutical company focused on the research, development, and commercialization of cardiometabolic prescription drugs using omega-3 or OM3 fatty acids delivered both as free fatty acids and bound-to-phospholipid esters, derived from krill oil. Acasti's lead product candidate was CaPre®, an OM3 phospholipid therapeutic for the treatment of hypertriglyceridemia.

21.     Grace was a Delaware corporation headquartered in East Brunswick, New Jersey. Grace was a privately held emerging biopharmaceutical company focused on developing innovative drug delivery technologies for the treatment of rare and orphan diseases. Grace's therapeutic pipeline consisted of three unique clinical stage and multiple pre-clinical stage assets supported by an intellectual property portfolio consisting of more than 40 granted and pending patents in various jurisdictions worldwide.

### II.   EVENTS LEADING TO THE MERGER

22.     The Proxy indicates that, following disappointing topline results for its TRILOGY 1 and TRILOGY 2 trials, in September 2020, the Company began to explore potential strategic transactions, including with Company A, which had made a non-binding merger offer.  The Proxy, however, did not disclose the terms and/or value of Company A's offer, other than stating that the Board determined it did not provide adequate value.

23.     As a result, the Board determined to consider other alternatives, with the intent to

conduct a canvassing of potential strategic opportunities, and engaged Oppenheimer as financial advisor to assist in conducting a broad strategic review process. The Board similarly determined that a reverse-merger transaction was the most realistic strategic alternative. To that end, on September 29, 2020, Acasti issued a press release announcing that it had commenced a process to explore and evaluate strategic alternatives, including an acquisition, merger, reverse merger, other business combination, sales of assets, and licensing or other strategic transactions involving Acasti, or a combination of these options.

24.     Following the public announcement, Oppenheimer commenced outreach. In the period between September 2020 and early January 2021, 18 companies signed a confidentiality agreement with Acasti, which included standstill provisions.

25.     By the end of October 2020, the Company had received written initial indications of interest from 21 companies, all of which were structured as reverse merger transactions. Following discussion, the Board selected four companies, consisting of Company B, Company C, Company D, and Company E, as transaction candidates that should proceed to the next round of the strategic review process. The Proxy provided a "brief summary" of the proposals received from these counterparties, but notably failed to disclose whether any of the proposals discussed or otherwise contemplated the post-close governance structure and/or composition of the combined company board of directors.

26.     Thereafter, the Company continued to engage in discussions with and perform due diligence on Companies B, C, D, and E. Then, "[o]n January 12, 2021, following a general shift in stock market conditions that started in December 2020 with an upward trend in the Company's share price, and an improved cash position of Acasti through capital raises under its ATM, Grace entered into the process and its financial advisor, William Blair & Company, L.L.C. ("William

Blair"), submitted an initial indication of interest to representatives of Oppenheimer for a reverse merger transaction." It is unclear from the Proxy whether Grace was included in Oppenheimer's initial outreach, and the Proxy did not provide any additional information regarding the method by which Grace "entered into the process" (*i.e.*, whether Grace had prior discussions and/or a prior affiliation with the Company or Company insiders).

27.     The Board convened on January 28 and 30, 2021, wherein it identified Grace, Company B, and Company C as the finalists in the strategic review process. The Proxy indicated that Company D and E were not selected as finalists "for different reasons, including their relatively low valuation of Acasti (particularly given Acasti's higher market capitalization at that time)." Notably however, Companies B and C each valued Acasti at approximately $27.5 million, with a post close ownership for Acasti shareholders of 15.9% and 9.9%, respectively, while Companies D and E valued Acasti at $30 million and $32.5 million, respectively, and post-close ownership of 9.3% and 17.3%, respectively. There was no indication in the Proxy that these parties revised their proposals. Thus, it appears that Companies D and E valued Acasti higher than Companies B and C, and that Company E had a superior offer to Companies B and C in terms of valuation and the post-close ownership for Acasti's current shareholders.

28.     According to the Proxy, "[a]t the same meeting, representatives of Oppenheimer discussed with the [Board] and management the implications of Acasti's recent significantly higher market capitalization and stronger cash position for a potential transaction" and the Board "formulated as an objective that ownership consideration for Acasti shareholders offered by the finalists in the process should be negotiated upwards to better align with the value ascribed by the market to Acasti, and its stronger cash position." The Board also determined to consider if, in the event of a successful upward negotiation of valuation, a transaction could be structured as an

acquisition by Acasti, with potential additional benefits, in addition to the greater ownership by Acasti shareholders. Inexplicably, however, the Board would thereafter approve entering into a 30-day exclusivity agreement with Company C to explore in more detail whether a transaction with Company C could be entered into, despite Company C's proposal contemplating a lower post-close ownership for current Acasti shareholders than Company B and Grace. Ultimately no mutually acceptable structure emerged from discussions between Acasti and Company C and the parties terminated the exclusivity agreement.

29.     Acasti's share price continued to rise through January and February 2021, reaching $1.20 by February 10, 2021, resulting in a market capitalization for Acasti of approximately $230 million as of that date. Continued access to its ATM program and exercises of outstanding warrants enabled Acasti to raise over $50 million between December 2020 and February 2021, ultimately providing Acasti with $61 million in cash as of March 31, 2021. As a result, in the context of the three finalists that were still part of the process in February 2021, this necessitated a renegotiation of their proposals to reflect such higher valuation, with a shift of the transaction structure from a reverse take-over of Acasti to an acquisition by Acasti in which, after issuance of Acasti shares as acquisition consideration, then-Acasti shareholders would continue to hold more than 50% of the outstanding shares of the combined company (on a non-diluted basis) at the closing of the transaction. The Board instructed Oppenheimer to present non-binding acquisition proposals to each of three finalists reflective of Acasti's higher market valuation at that time. The Proxy again failed to disclose the terms of these proposals, including whether Acasti included governance and/or management terms.

30.     Only Grace was accepting of substantially all of the key materials terms of Acasti's proposal. Thereafter, the Company entered into exclusivity with Grace and, from the end of

February 2021 until May 6, 2021, the Company and Grace negotiated the Merger.

31.     On May 7, 2021, Acasti issued a press release announcing the Proposed Merger.

32.     Notably, following the completion of the Merger, the Board was expected to be comprised of: (i) William A. Haseltine and Vimal Kavuru, each a then-current director of Grace; (ii) one (individual to be designated by Grace stockholders representing a majority of the Acasti common shares held by such Grace stockholders at the relevant time; and (iii) Individual Defendants Carter, Canan, D'Alvise, and Olds, each a then-current director of Acasti. Also following the completion of the Merger, D'Alvise, CEO of Acasti, was to remain as the CEO of the combined company.

33.     Concerningly however, Grace's equity ownership and voting power were concentrated amongst a small group of shareholders:

Except as otherwise indicated in the table below, addresses of named beneficial owners are c/o Grace Therapeutics Inc., 2 Tower Center Boulevard, Suite 1101G, East Brunswick, NJ 08816.

|  | Total Number of Class A Shares Beneficially Owned | Percentage of Class A Common Stock Beneficially Owned |
| --- | --- | --- |
| **5% or Greater Stockholders:** |  |  |
| Rajitha Grace 2018 Irrevocable Trust[1] | 6,600,000 | 33.0% |
| Kavuru 2017 Grace Therapeutics LLC Irrevocable Family Trust[2] | 3,600,000 | 18.0% |
| Shore Pharma LLC[3] | 3,329,000 | 16.6% |
| S. George Kottayil | 2,950,000 | 14.8% |
| SS Pharma LLC[4] | 2,200,000 | 11.0% |
| Kottayil Grace Pharma LLC[5] | 1,050,000 | 5.3% |
| **Executive Officers and Directors:** |  |  |
| Vimal Kavuru | 3,329,000 | 16.6% |
| Subha Thogarchedu | 2,200,000 | 11.0% |
| S. George Kottayil | 4,000,000 | 20.1% |
| All current executive officers and directors as a group (three persons) | 9,529,000 | 47.7% |

The trustee of the Rajitha Grace 2018 Irrevocable Trust was Swami Sambamurty; the trustee of the Kavuru 2017 Grace Therapeutics LLC Irrevocable Family Trust was Sudha Kavuru; and the remaining shareholder entities' sole members were Grace insiders. Accordingly, because the Merger and Exchange Ratio contemplated then-existing Grace stockholders owning up to 45% of the combined post-close company, following the Merger, if the then-existing Grace stockholders were to act as a group, they could exert substantial control over the outcome of all matters submitted to the Company's shareholders for approval. And, indeed, to this point, in connection

with the execution of the Merger Agreement, Acasti entered into voting agreements with certain Grace stockholders who owned in the aggregate approximately ***98%*** of the outstanding shares of Grace Class A common stock as of June 30, 2021, which strongly suggested that nearly all of Grace's stockholders act in near unison. As a result, while all then-Acasti shareholders were nominally maintaining 55% control of the combined Company's stock, it appears that Grace shareholders would actually form a *de facto* 45% control block.

34.     On August 26, 2021, Acasti shareholders approved the Merger. Notably, despite the fact that (a) there were 208,375,549 outstanding shares of Acasti common stock entitled to vote on the Merger, (b) only 79,679,548 shares were actually present or represented, representing just 36.32% of all outstanding shares, and (c) even worse, *only 21,915,935 shares were actually cast in favor of the Merger – such that the Merger was approved by a mere 10.5% of all outstanding shares*.[2] What is more, Acasti's directors and executive officers cumulatively held approximately 3.9% of Acasti's outstanding shares, and the Proxy represented that Acasti expected those directors and executive officers to vote their shares in favor of the Merger. That means that, excluding these directors and executive officers, who were expected to vote in favor of the Merger, *only 6.6% of the Company's non-insider, total outstanding shares voted in favor of the Merger*.

35.     The Merger closed on August 27, 2021. After giving effect to the adjustments provided in the Merger Agreement based on each company's capitalization and net cash balances, a total of 145,929,867 common shares of Acasti were issued to Grace stockholders as

---

[2]     This bizarre outcome is the result of Acasti's quorum and voting rules, pursuant to which a mere 33.33% of outstanding shares need be present to form a quorum; all common shares represented at an annual or special meeting, including broker non-votes and Acasti common shares that are represented but that abstain from voting, are treated as present and entitled to vote for purposes of determining the presence or absence of a quorum; and the approval of the Merger required just the affirmative vote of a majority of the votes cast on it at the special meeting.

consideration for the acquisition, bringing the total number of Acasti common shares issued and outstanding to 354,305,416 (prior to the reverse stock split referenced in the Proxy).

## III.   THE PROXY OMITTED MATERIAL INFORMATION WHICH RENDERED IT MISLEADING

36.     On July 15, 2021, Defendants solicited Acasti shareholders to vote in favor of the Merger by causing the materially incomplete and misleading Proxy to be filed with the SEC and disseminated to the Company's shareholders.   The Proxy, which recommended that Acasti shareholders vote in favor of the Merger, omitted and misrepresented material information about the intrinsic value of the Company and its future prospects, and caused Acasti's shareholders to be misled when they voted in favor of the Merger without access to the below-referenced material information that was necessary for them to make an informed decision regarding whether to approve the Merger.

37.     Defendants, as directors and/or officers of the Company, had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, as set forth herein, Defendants breached that duty and were therefore negligent, as the omission of projections rendered specific portions of the Proxy misleadingly incomplete.

38.     Information relating to the financial condition, solvency, and profitability of a company is plainly material to its shareholders. Complete and accurate financial projections are necessary for shareholders when deciding how to vote on a merger, because company managers and bankers with inside information have meaningful insight into a company's future that the market does not. Thus, complete and accurate projections speak directly to the question forced upon shareholders by a merger: what is the financial value of the merger?

39.     Therefore, when corporate actors voluntarily elect to speak regarding projections

and valuation-related information, they assume an obligation to do so in a complete and accurate manner.  When it comes to disclosing projections and valuation information, a company may choose silence or speech elaborated by the factual basis as then known – but it may not choose incomplete half-truths.  If one speaks on a topic, he is bound not only to state the truth but also not to withhold any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure.  The selective disclosure of valuation information here was misleading because, by providing only a partial "summary" of valuation analyses without the projections that form the basis of those analyses, shareholders were unable to properly assess the overall valuation picture of the Company and Merger. Disclosing only a subset of available financial information, while withholding another subset of distinct financial information that alters the overall valuation picture created by the disclosed numbers, is misleading.

### A.       The Proxy Omitted Critical Financial Projections

40.       First, and foremost, the Proxy entirely omitted any financial projections for Grace (the "Grace Projections").

41.       Free cash flow projections are the single most important financial metric when valuing a company. For this reason, the disclosure of cash flow projections is a staple in the vast majority of proxy statements filed by publicly traded companies in connection with mergers.  In fact, in Acasti's most recent 10-K, Defendants acknowledge the importance of cash flows, referencing them 23 times throughout the filing. However, here, Defendants conspicuously withheld any form of Grace's after-tax cash flow projections from Company shareholders – despite the fact that the Board specifically relied on these projections in recommending the Merger and Oppenheimer specifically relied on these projections in performing its financial analyses in favor of the Merger.

42.     Specifically, the Proxy states that:

a)  The Board's recommendation in favor of the Merger anticipated certain benefits of the Merger, those "anticipated benefits assume a successful integration *and are based on projections*…." Proxy at 40.

b)  In connection with its fairness opinion, Oppenheimer specifically reviewed, analyzed, and relied upon among other things, "financial forecasts and estimates related to Grace prepared by the management of Grace, as *adjusted by management of Acasti* and approved for Oppenheimer's use by Acasti. Proxy at 107.

c)  "With respect to the Projections, Oppenheimer assumed, *at the direction of Acasti management and with Acasti's consent*, without independent verification or investigation, that those forecasts and estimates were reasonably prepared on bases reflecting the best available information, estimates and judgments of Grace, as adjusted by Acasti management, as to Grace's future financial condition and operating results." Proxy at 108.

d)  "Oppenheimer assumed, *based on discussions with Acasti management*, that the Projections provided a reasonable basis upon which Oppenheimer could form its opinion and Oppenheimer expressed no view as to any such information or the assumptions or bases therefor. Oppenheimer relied on all such information without independent verification or analysis and did not in any respect assume any responsibility or liability for the accuracy or completeness thereof." Proxy at 108.

43.     What is more, in performing its Discounted Cash Flow ("DCF") analysis of Grace,

in which it implied a potential current value of Grace and, therefore the combined company, Oppenheimer specifically utilized "the estimated present value of the standalone after-tax free cash flows that Grace management forecasted to be generated during the calendar years ending December 31, 2021 through the calendar year ending December 31, 2031." Proxy at 111.

44.     Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows.[3] Here, Oppenheimer obviously agreed, utilizing that metric in performing its DCF analysis.

45.     What is more, the Grace Projections were all the more material in this case in light of the fact that the Merger would result in the combination of Acasti (55%) and Grace (45%) on a near-equal basis, such that Grace's free cash flows would form a substantial, near-equal part of the combined Company's future free cash flows. Indeed, Defendants repeatedly touted the combined Company's alleged prospects:

> a) "[T]he Acasti board considered that a reverse merger transaction could provide Acasti shareholders with a meaningful stake in a combined company possessing potentially promising clinical prospects and the means to pursue them, establishing the opportunity for long-term value creation for Acasti shareholders." Proxy at 95.
>
> b) Recommending Merger "[b]ased in part on the scientific diligence and

_____

[3]     Cornelius J. Casey and Norman J. Bartczak, *Cash Flow—It's Not the Bottom Line*, Harvard Bus. Rev. (1984) ("A growing number of securities analysts, financial writers, and accounting policymakers contend that financial statements providing information of a company's cash flows yield a better measure of operating performance than do the company's income statement and balance sheet.  According to recent surveys, corporate and government officials have accepted this view; they rated cash flow data the most important piece of information contained in published financial statements.  The trend toward wider acceptance of this yard-stick has been building since the early 1970s.  Accelerating the trend have been several developments … that put greater distance between a company's net income and its cash flow.") (emphasis added).

analysis of Grace's product pipeline, the potential market opportunity for its products and the expertise of its scientific team, Acasti's board of directors believes that Grace's product candidates have the potential to meet unmet medical needs that currently exist and address a sizable market opportunity, thereby creating value for the shareholders of the combined organization and an opportunity for Acasti shareholders to participate in the potential growth of the combined organization." Proxy at 104.

c) Recommending Merger based, in part, on "Acasti's board…review[ of] its assessment of Grace's drug development capabilities and technologies with Acasti's management. Based in part on this analysis, Acasti's board of directors believes that Grace has the potential to develop multiple new therapies using its drug formulation expertise and applying its platform drug delivery technologies that would broaden Acasti's pipeline, which in turn may reduce the risk to the combined organization and its shareholders that one or more of its product candidates is not commercialized." Proxy at 104.

d) Recommending Merger based, in part, on "Acasti's board consider[ation of] the strength of the balance sheet and sufficiency of the expected cash resources of the combined organization." Proxy at 104.

e) Recommending Merger based, in part, on "Acasti's board…review[] with Acasti's management [of] the current operating plans of Grace to confirm the likelihood that the combined organization would possess sufficient financial resources to allow the management team to focus on

implementing Grace's business plan and growing Grace's business. Acasti's board also considered the ability of Grace to take advantage of the potential benefits resulting from becoming a part of a public reporting company listed on Nasdaq should the combined company be required to raise additional equity or debt in the future." Proxy at 104.

46.     In other words, regardless of the form of the merger consideration, the question shareholders need to assess when faced with a merger transaction is the same: is the merger value fair?  In regards to the Merger, Acasti shareholders needed the Grace Projections to answer this question. Indeed, the singular use of the Grace Projections by Oppenheimer indicates that they are *the* projections required to properly assess the fairness of the Merger and value both the acquisition of Grace as a stand-alone entity and the combined Company on a *pro forma* basis.  By failing to disclose *any* projections for Grace, it was literally impossible for Acasti shareholders to compare the value of their existing, standalone Acasti shares against the value of shares in the future combined Company according to the approach favored by Defendants' own financial advisor, or even check that Oppenheimer's inputs and assumptions were reasonable.  By withholding the Grace Projections, the Proxy skewed the financial picture and prevented shareholders from assessing the value of the Merger.

47.     This omission was particularly material here because Grace was a  privately held emerging biopharmaceutical company, and Acasti shareholders thus had no way of assessing Grace's future financial prospects from other public sources. As noted above, the Proxy repeatedly urged Acasti shareholders to support the Merger based upon Grace's prospects, but Defendants withheld the information Acasti shareholders needed to meaningfully assess and understand those prospects , *i.e.*, the Grace Projections.

48.     In sum, the Grace Projections (1) were readily available;  (2) were utilized by the

Board and Oppenheimer to value Grace; (3) were the key input in Oppenheimer's most important

valuation methodology; (4) served as a material factor in the Board's decision to approve the

Merger and for Oppenheimer to find the equity exchange ratio "fair" to Acasti's shareholders; and

(5) were critical to shareholders in determining whether to proceed as a standalone company or

vote in favor of the Merger and, thus, the combined Company. Accordingly, the Grace projections

were plainly material and spoke squarely to the question that the Company's shareholders had to

answer in determining whether to vote in favor of the Merger: is a smaller stake in the combined

company more or less valuable than a full stake in the standalone company? Without the Grace

Projections, Defendants presented the Company's shareholders with only a fraction of the

equation, rendering them unable to answer this question and assess the fairness of the Merger. As

a result, the omitted Grace Projections were plainly material to shareholders that Defendants were

negligent in omitting from the Proxy.

**B.     The Omitted Grace Projections Rendered the Following Portions of the Proxy Misleadingly Incomplete**

49.     <u>First</u>, the omission of the Grace Projections rendered the "summary" of

Oppenheimer's material[4] *Discounted Cash Flow Analysis* on page 111 of the Proxy misleadingly

incomplete. It provided:

> Oppenheimer conducted a discounted cash flow analysis, which is designed to
> imply a potential current value of Grace by calculating the estimated present value
> of the standalone after-tax free cash flows that Grace management forecasted to be
> generated during the calendar years ending December 31, 2021 through the
> calendar year ending December 31, 2031. Oppenheimer calculated terminal values
> for Grace by applying a range of declining perpetuity rates of 0.0% to 1.0% to
> calendar year 2031 unlevered free cash flow in order to derive a range of terminal

---

[4]     In drafting the Proxy, Defendants literally conceded the materiality of Oppenheimer's
valuation analyses, stating, "The following is a summary of the ***material*** financial analyses
presented by Oppenheimer to the Acasti board of directors in connection with its opinion." Proxy
at 109 (emphasis added).

values for Grace. The cash flow and terminal values were then discounted to present value using discount rates ranging from 10.5% to 11.5%, which were based on an estimated weighted average cost of capital. After adding Grace's net cash balance of $700,000 as of March 31, 2021, excluding its PPP loan (based on internal estimates provided by Grace management, as directed to be used by Acasti), Oppenheimer derived an approximate implied total equity value of Grace of $174.4 million to $227.5 million.

50.      As set forth herein, Oppenheimer could not have performed its DCF analyses without the Grace Projections. Without the Grace Projections, Acasti shareholders were thus unable to properly assess the fairness of the Merger. Simply put, a so-called "summary" of a valuation analysis is misleading if underlying assumptions or key inputs are omitted, particularly when, as here, shareholders are impeded from recognizing how significantly undervalued their shares are as compared to the "implied" valuation range they have been given because of the omission.

51.      This is all the more true in light of the fact that DCF analyses are highly subjective and prone to manipulation to ensure the desired outcome – that the merger consideration and transaction at issue appear "fair" to shareholders.  As a one scholar  explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions:

> A fairness opinion's worth ultimately lies in the reliability and accuracy of its underlying valuation analyses.  This is the realm of finance - and academics have made significant strides in the previous decades to develop techniques by which a theoretically reliable range of values can be achieved.  However, there is still an element of subjectivity present in the choice and application of these methods.  **The end-result is to provide the preparer discretion to effect the outcome of a valuation and a diminished ability for outsiders to make comparative assessments of analyses**.
>
> There are a number of different underlying valuation analyses upon which a fairness opinion can rest.  The most common and accepted techniques are discounted cash flow, comparable companies, premium, break-up, and liquidation analysis.  The preparer of a

fairness opinion will typically utilize a weighted combination of these to arrive at a fairness conclusion.  The choice of a particular analysis to employ and the weight given to each is partially subjective and depends upon the asset being valued and the relevant circumstances.  **For example, in the corporate control transaction paradigm the most important analysis is, absent unusual circumstances, the discounted cash flow calculus**.  However, in the investment banking community, there are no uniform, specific, and objective guidelines as to the exact mix and weight to assign to each of these methods to arrive at fairness.

Each of the techniques in and of themselves is also prone to subjectivity.  **For example, a discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation.  These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset.  There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value.  For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars**.  However, again there is no standard-setting or other body guiding these or other preparation decisions.  Rather, a discounted cash flow analysis, like other valuation analyses, is typically compiled using historically developed and unguided industry practices as influenced and first put forth by academic practitioners.  This lends itself to differences in valuation approach in each application and among institutions as each of them develops their own individual approach.  This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques.

**This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices.  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness**.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U. L. Rev. 1557, 1573-78 (2006) (emphasis

added).

52.     Indeed, in the Proxy, Oppenheimer specifically warned that "its analyses and the summary of its analyses must be considered *as a whole* and that selecting portions of its analyses and factors or focusing on the information presented below in tabular format, without considering all analyses ***and factors*** or the full narrative description of the financial analyses, including the methodologies ***and assumptions underlying the analyses***, *could create a misleading or incomplete view of the process underlying its analyses and opinion*." Proxy at 109. Despite this explicit warning, the Proxy withheld the single most important "factor" and "assumption[]" underlying" the DCF – the free cash flows that went into it.

53.     Exacerbating this financial ambiguity, the Proxy also entirely failed to disclose **any** financial projections for Acasti or for the *pro forma* combined Company.

54.     In short, cash flow projections are the most important projected metric to understanding a DCF analysis, and they were not provided at all in the Proxy.  By withholding the key input that formed the basis of Oppenheimer's DCF Analysis, such that it was incompletely "summarized" in the Proxy, Defendants could hardly have done a better job of obfuscating Oppenheimer's financial analyses, even had they deliberately set out to do so.

55.     Simply stated, one cannot properly assess and recognize the legitimacy or lack thereof of a financial advisor's fairness opinion valuation analyses unless the key financial metrics and inputs associated with the analyses are disclosed.  Here, the Defendants allowed the Proxy to incompletely and misleadingly "summarize" Oppenheimer's valuation analyses.  The summary of Oppenheimer's DCF Analysis on page 111 of the Proxy was materially incomplete and misleading because it failed to disclose the key inputs that were necessary for shareholders to fully recognize the illegitimacy of the analyses and assess how off-base the misleading resulting implied equity

value was.

56.     <u>Second</u>, the Proxy told Acasti shareholders that "[t]he merger may be completed even though certain events occur prior to the closing that materially and adversely affect Acasti or Grace[,]" including "any *failure of Grace to meet projections, guidance, milestones, forecasts* or published financial or operating predictions or measures." Because shareholders were not provided with the Grace Projections, they had no way to assess whether anything occurred prior to voting on the Merger that was likely to cause Grace to fail to meet its projections. This statement was thus misleadingly incomplete as it omitted critical information necessary for shareholders to assess whether Grace was actually on track to meet its projections at the time the Merger was approved.

57.     <u>Third</u>, the omission of the Grace Projections rendered the Board's recommendation in favor of the Merger materially misleading.

58.     In the Proxy, the Individual Defendants unanimously recommended that Acasti shareholders vote in favor of the Merger – on no less than nine separate occasions. Proxy at intro letter, 2, 5, 14, 19, 69, 74, 104-05, 132-33. Notably, in the section of the Proxy entitled "Recommendation of the Acasti Board of Directors; Acasti's Reasons for the Merger," the Individual Defendants specifically cite Grace's future "operating plans" and Oppenheimer's valuation of Grace, which was based on the Grace Projections, as reasons for their unanimous recommendation to shareholders to vote in favor of the Merger:

> In the course of its evaluation of the merger agreement and merger with Grace, the Acasti board held weekly meetings, consulted with Acasti senior management, outside legal counsel and its financial advisor, and reviewed and assessed a significant amount of information, and considered a large range of factors, including the following:
>
> * * *
>
> * Acasti's board of directors also reviewed with Acasti's management the current operating plans of Grace to confirm the likelihood that the combined organization would possess sufficient financial resources to allow the

management team to focus on implementing Grace's business plan and growing Grace's business.

- Acasti's board of directors considered the financial analyses of Oppenheimer, including its opinion to Acasti's board (in its capacity as such) as to the fairness to Acasti, from a financial point of view and as of the date of the opinion, of the equity exchange ratio, as more fully described below under the caption "The Merger—Opinion of Acasti's Financial Advisor."

59.     However, despite the Board's explicit reliance on the Grace Projections, Oppenheimer's valuation of Grace exclusively utilizing the Grace Projections, and Acasti management's adjustment made to the Grace Projections in approving and recommending the Merger to shareholders, the Proxy failed to disclose even a summary of the projections, thereby rendering the Board's unanimous recommendation in favor of the Merger misleadingly incomplete.

60.     <u>Fourth</u>, as noted above, Acasti management also *adjusted* the projections it received from Grace and ordered Oppenheimer to use those adjusted projections. By failing to disclose the Grace Projections, Acasti shareholders had no idea *how* Acasti management adjusted the numbers it received from Grace, which was material information. Indeed, Acasti management obviously wanted the Merger to go through and knew a fairness opinion was a prerequisite for the deal, and it was thus material for shareholders to understand how and to what magnitude the numbers were adjusted by Acasti management. Thus, the omission of the Grace Projections rendered this partial and elliptical disclosure regarding Acasti management's adjustments misleadingly incomplete.

* * *

61.     In sum, the omission of the above-referenced, material information rendered the Proxy misleadingly incomplete, in contravention of the Exchange Act.

24

## IV.    PLAINTIFF AND THE CLASS SUFFERED FINANCIAL LOSS AS A RESULT OF THE FALSE AND MISLEADING PROXY, WHICH WAS AN ESSENTIAL LINK NECESSARY TO EFFECTUATE THE UNFAIR MERGER

62.    The omission of the Grace Projections was material because it bore directly on the singular most important consideration to shareholders voting on a merger transaction – the value of the Merger itself. The misrepresentation is all the more egregious in light of the facts that (a) that members of the Board and management conducted concurrent communications during the negotiations that resulted in the Merger Agreement and secured post-close directorships for themselves in connection therewith and (b) the Board evaluated and ultimately rejected multiple other offers that may have led to no personal benefits for its members. As a result of the foregoing omissions and materially misleading statements, Plaintiff and all other Acasti shareholders were harmed, in that they approved a Merger that overcompensated Grace shareholders for their stake in the surviving Company, thereby reducing the value of Acasti shareholders' stake in the combined Company. Indeed, under a Selected Public Company Analysis, Acasti's equity value represented as much as 74% of the combined company's equity value, and under a Selected Transactions Analysis it represented as much as 67% of the combined company equity value, yet Acasti shareholders ended up with a significantly smaller ownership stake of approximately 58.7%.

63.    Moreover, the market has recognized the unfairness of the Merger to Acasti shareholders, as the Company's stock price declined significantly since the Merger was completed on August 27, 2021, from $3.47 to $1.99 as of October 1, 2021. The drop was caused by the completion of the Merger, as no other negative news or events regarding the companies has occurred during that time period. Indeed, the precipitous price decline began immediately after the announcement that the Merger was completed, as evinced by the chart below:



64.     In sum, the materially misleading Proxy was an essential link in accomplishing the

Merger, as it the Merger could not have been approved or completed without the consent of Acasti

common shareholders and was thus the proximate cause of the financial loss Plaintiff and the Class

have suffered since the Merger's consummation—amounting to a loss of at least $1.48 per share.

## CAUSES OF ACTION

## COUNT I

**(Against All Defendants for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9)**

65.     Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

66.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the

use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

67.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

68.     The omission of information from a proxy statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

69.     Defendants issued the Proxy with the intention of soliciting the Company's public common stockholders' support for the Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which failed to provide critical information regarding, *inter alia*, the financial analyses and financial projections relied upon by the Board and its financial advisor.

70.     In so doing, Defendants omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy,

but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

71.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon all of the omitted information identified above in connection with their decision to approve and recommend the Merger. Indeed, the Individual Defendants were privy to and had knowledge of the process leading up to the signing of the Merger Agreement and preparation and review of the Proxy; the Proxy states that the Board considered the fairness opinion provided by Oppenheimer and the assumptions made and matters considered in connection therewith; and the Individual Defendants were further required to review Oppenheimer's analyses in connection with their receipt of the fairness opinion, question Oppenheimer as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be misleadingly incomplete.

72.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual

Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of the Proxy.

73.    Acasti is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

74.    The misrepresentations and omissions in the Proxy were material to Plaintiff and the Class, who were deprived of their right to cast an informed vote. The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information available to stockholders.

75.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain stockholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to 14(a) of the Exchange Act and SEC Rule 14a-9.

## **COUNT II**

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

76.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.    The Individual Defendants acted as controlling persons of Acasti within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in

the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. As outlined above, much, if not all, of the omitted information identified above was specifically reviewed by the Board prior to voting on the Merger and prior to disseminating the Proxy. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in preparing this document.

80.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

81.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.     Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C.     Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.     Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.


//


//

Dated: October 1, 2021

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*