**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LAUDEN BISEL, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:21-cv-06051 |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | <u>CLASS ACTION</u> |
| ACASTI PHARMA, INC., RODERICK CARTER, JAN D'ALVISE, JOHN CANAN, and DONALD OLDS, | |
| Defendants. | |

**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Lead Plaintiff Michael Castaldo ("Plaintiff"), individually and on behalf of all others similarly situated, by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**<u>NATURE OF THE ACTION</u>**

1.      This is a putative class action brought by Plaintiff on behalf of himself and the pre-Merger (as defined below) holders of the common stock of Acasti Pharma Inc. ("Acasti" or the "Company") (other than Defendants outlined below) against the Company and the members of the Company's board of directors (the "Board" or the "Individual Defendants" and, together with Acasti, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, in connection with the merger between Acasti and Grace Therapeutics Inc. ("Grace") (the "Merger").

2.      On May 7, 2021, Acasti and Grace entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which Acasti Pharma U.S., Inc., a wholly-owned subsidiary of Acasti, would be merged with and into Grace, with Grace emerging as the surviving corporation and a wholly-owned subsidiary of Acasti. The Merger Agreement provided for an equity exchange ratio which was calculated using a formula intended to allocate Grace's pre-Merger stockholders (on a fully-diluted basis) an ownership percentage of post-closing Acasti, based on a base valuation for Acasti of $108 million and for Grace of $71 million and as adjusted based on changes to (i) Acasti's net cash and Grace's net cash and (ii) Acasti's and Grace's capitalization prior to the consummation of the merger, with Acasti shareholders to own at least 55% and existing Grace stockholders to own at most 45% of the outstanding capital stock of the combined company on a fully-diluted basis (the "Exchange Ratio").

3.      On July 15, 2021, to convince Acasti's public shareholders to vote in favor of the Merger, Defendants signed and/or authorized the filing of a proxy statement/prospectus with the SEC (the "Proxy"). Therein, Defendants touted the fairness of the Merger to Acasti shareholders, but provided false or misleadingly incomplete statements surrounding the financial projections and valuation of Grace. These false and misleading statements concerned material information that was necessary for Acasti stockholders to recognize the unfairness of the Merger and that Defendants had overvalued Grace.

4.      Defendants entirely withheld the financial projections for Grace prepared by Grace management (the "Grace Management Projections") and failed to disclose the upward adjustments made to the Grace Management Projections by Acasti management before they approved the projections for use by their financial advisor to prepare a fairness opinion (the "Adjusted Grace Projections," and, collectively with the Grace Management Projections, the "Grace Projections").

Without this key information, Acasti shareholders were misled regarding the value of Grace and the fairness of the Merger. Specifically, these omissions rendered the statements about Acasti management's adjustments to the Grace Management Projections and the Proxy's summary of the valuation analyses performed by Acasti's financial advisor, Oppenheimer & Co., Inc. ("Oppenheimer"), in support of its fairness opinion misleading.

5.      The Acasti shareholder vote in connection with the Merger occurred on August 26, 2021. Notably, despite the fact that (a) there were 208,375,549 outstanding shares of Acasti common stock entitled to vote on the Merger, (b) only 79,679,548 shares were actually present or represented, representing just 36.32% of all outstanding shares, and (c) even worse, only 21,915,935 shares were actually cast in favor of the Merger – such that the Merger was approved by a mere 10.5% of all outstanding shares. What is more, Acasti's directors and executive officers cumulatively held approximately 3.9% of Acasti's outstanding shares, and the Proxy represented that Acasti expected those directors and executive officers to vote their shares in favor of the Merger. That means that, excluding these directors and executive officers, who were expected to vote in favor of the Merger, only 6.6% of the Company's non-insider, total outstanding shares voted in favor of the Merger.  Acasti announced the close of the Merger the very next day on August 27, 2021.

6.      Upon consummation of the Merger, based on the companies' net cash and capitalization, Acasti's pre-Merger stockholders owned approximately 58.8% of the combined company's common shares and former Grace stockholders owned approximately 41.2%.

7.      As set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act. Plaintiff seeks to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985) (citing *Mariash v. Morrill*, 496 F.2d 1138, 1143 (2d Cir. 1974)); *Garg v. Winterthur*, 525 F. Supp. 2d 315, 318 (E.D.N.Y. 2007) (same). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's common shares trade on The Nasdaq Capital Market, which is headquartered in this District, and the Proxy was mailed into New York, where members of the Class undoubtedly reside. Furthermore, Acasti's agent for service, its proxy solicitor, its financial advisor in connection with the Merger, and  its outside counsel in connection with the Merger are all located in this District; Grace's outside counsel in connection with the

Merger is located in this District; and the Merger Agreement specifically provides that the closing of the Merger would take place at the New York office of Acasti's outside counsel in connection with the Merger, which is located in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Acasti common stock.

12.     Defendant Acasti is a biopharmaceutical company incorporated in Québec, Canada with headquarters in Laval, Québec, Canada. Acasti's common stock trades on the Nasdaq and the TSX Venture Exchange under the ticker symbol "ACST."

13.     Individual Defendant Roderick Carter ("Carter") is, and has been at all relevant times, a director and Chairman of the Board of Acasti.

14.     Individual Defendant Jan D'Alvise ("D'Alvise") is, and has been at all relevant times, a director, President and Chief Executive Officer of Acasti.

15.     Individual Defendant John Canan ("Canan") is, and has been at all relevant times, a director of Acasti.

16.     Individual Defendant Donald Olds ("Olds") is, and has been at all relevant times, a director of Acasti.

17.     Defendants identified in paragraphs 13 through 16 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

18.     Defendant D'Alvise signed the letter transmitting the Proxy and all four Individual Defendants signed the Proxy (though their agent, Defendant D'Alvise). Proxy at II-6.

## SUBSTANTIVE ALLEGATIONS

### I.   RELEVANT CORPORATE BACKGROUND

19.     Acasti is a biopharmaceutical company focused on the research, development, and commercialization of cardiometabolic prescription drugs using omega-3 or OM3 fatty acids delivered both as free fatty acids and bound-to-phospholipid esters, derived from krill oil.

20.     Prior to the Merger, Grace was a Delaware corporation headquartered in East Brunswick, New Jersey. Since 2014, Grace was a privately held  rare and orphan disease specialty pharmaceutical company focused on developing and commercializing products using novel drug delivery technologies. Grace's therapeutic pipeline consisted of three primary orphan designated clinical stage assets: GTX-101, GTX-102, and GTX-104. Grace's (and now Acasti's) business prospects are significantly tied to these three lead products. To date, Grace has operated at a loss every year since its formation and has not recognized any revenues.

### II.  EVENTS LEADING TO THE MERGER

21.     The Proxy indicates that in September 2020, the Company began to explore potential strategic transactions, including with Company A, which had made a non-binding merger offer.  The Proxy, however, did not disclose the terms and/or value of Company A's offer, other than stating that the Board determined it did not provide adequate value.

22.     After the offer, the Board determined to consider other alternatives, with the intent to conduct a canvassing of potential strategic opportunities, and engaged Oppenheimer as financial advisor to assist in conducting a broad strategic review process. The Board then determined that a reverse-merger transaction was the most realistic strategic alternative. To that end, on September 29, 2020 Acasti issued a press release announcing that it had commenced a process to explore and evaluate strategic alternatives, including an acquisition, merger, reverse merger, other business

combination, sales of assets, and licensing or other strategic transactions involving Acasti, or a combination of these options.

23.     Following the public announcement, Oppenheimer commenced outreach. In the period between September 2020 and early January 2021, 18 companies signed a confidentiality agreement with Acasti, which included standstill provisions.

24.     By the end of October 2020, the Company had received written initial indications of interest from 21 companies, all of which were structured as reverse merger transactions. Following discussion, the Board selected four companies, consisting of Company B, Company C, Company D, and Company E, as transaction candidates that should proceed to the next round of the strategic review process. The Proxy provided a "brief summary" of the proposals received from these counterparties, but notably failed to disclose whether any of the proposals discussed or otherwise contemplated the post-close governance structure and/or composition of the combined company board of directors.

25.     Thereafter, the Company continued to engage in discussions with and perform due diligence on Companies B, C, D, and E. Then, "[o]n January 12, 2021, following a general shift in stock market conditions that started in December 2020 with an upward trend in the Company's share price, and an improved cash position of Acasti through capital raises under its ATM, Grace entered into the process and its financial advisor, William Blair & Company, L.L.C. ("William Blair"), submitted an initial indication of interest to representatives of Oppenheimer for a reverse merger transaction." It is unclear from the Proxy whether Grace was included in Oppenheimer's initial outreach, and the Proxy did not provide any additional information regarding the method by which Grace "entered into the process" (*i.e.*, whether Grace had prior discussions and/or a prior affiliation with the Company or Company insiders).

26.     The Board convened on January 28 and 30, 2021, wherein it identified Grace, Company B, and Company C as the finalists in the strategic review process. The Proxy indicated that Company D and E were not selected as finalists "for different reasons, including their relatively low valuation of Acasti (particularly given Acasti's higher market capitalization at that time)." Notably however, Companies B and C each valued Acasti at approximately $27.5 million, with a post close ownership for Acasti shareholders of 15.9% and 9.9%, respectively, while Companies D and E valued Acasti at $30 million and $32.5 million, respectively, and post-close ownership of 9.3% and 17.3%, respectively. There was no indication in the Proxy that these parties revised their proposals. Thus, it appears that Companies D and E valued Acasti higher than Companies B and C, and that Company E had a superior offer to Companies B and C in terms of valuation and the post-close ownership for Acasti's current shareholders.

27.     According to the Proxy, "[a]t the same meeting, representatives of Oppenheimer discussed with the [Board] and management the implications of Acasti's recent significantly higher market capitalization and stronger cash position for a potential transaction" and the Board "formulated as an objective that ownership consideration for Acasti shareholders offered by the finalists in the process should be negotiated upwards to better align with the value ascribed by the market to Acasti, and its stronger cash position." The Board also determined to consider if, in the event of a successful upward negotiation of valuation, a transaction could be structured as an acquisition by Acasti, with potential additional benefits, in addition to the greater ownership by Acasti shareholders. Inexplicably, however, the Board would thereafter approve entering into a 30-day exclusivity agreement with Company C to explore in more detail whether a transaction with Company C could be entered into, despite Company C's proposal contemplating a lower post-close ownership for current Acasti shareholders than Company B and Grace. Ultimately no

mutually acceptable structure emerged from discussions between Acasti and Company C and the parties terminated the exclusivity agreement.

28.     Acasti's share price continued to rise through January and February 2021, reaching $1.20 by February 10, 2021, resulting in a market capitalization for Acasti of approximately $230 million as of that date. Continued access to its ATM program and exercises of outstanding warrants enabled Acasti to raise over $50 million between December 2020 and February 2021, ultimately providing Acasti with $61 million in cash as of March 31, 2021. As a result, in the context of the three finalists that were still part of the process in February 2021, this necessitated a renegotiation of their proposals to reflect such higher valuation, with a shift of the transaction structure from a reverse take-over of Acasti to an acquisition by Acasti in which, after issuance of Acasti shares as acquisition consideration, then-Acasti shareholders would continue to hold more than 50% of the outstanding shares of the combined company (on a non-diluted basis) at the closing of the transaction. The Board instructed Oppenheimer to present non-binding acquisition proposals to each of three finalists reflective of Acasti's higher market valuation at that time. The Proxy again failed to disclose the terms of these proposals, including whether Acasti included governance and/or management terms.

29.     Only Grace was accepting of substantially all of the key material terms of Acasti's proposal. Specifically, on February 19, 2021, Acasti provided a proposal to Grace that would result in a post-closing ownership allocation of 55% for Acasti shareholders and 45% for Grace stockholders. In other words, by that date, Defendants already had a specific target exchange ratio in mind, even though diligence and negotiations with Grace were far from complete. Thereafter, the Company entered into exclusivity with Grace and, from the end of February 2021 until May 6, 2021, the Company and Grace negotiated the Merger.

30.     On May 7, 2021, Acasti issued a press release announcing the Proposed Merger.

31.     Notably, following the completion of the Merger, the Board was expected to be comprised of: (i) William A. Haseltine and Vimal Kavuru, each a then-current director of Grace; (ii) one individual to be designated by Grace stockholders representing a majority of the Acasti common shares held by such Grace stockholders at the relevant time; and (iii) Individual Defendants Carter, Canan, D'Alvise, and Olds, each a then-current director of Acasti. Also following the completion of the Merger, Defendant D'Alvise, CEO of Acasti, was to remain as the CEO of the combined company.

32.     Concerningly however, Grace's equity ownership and voting power were concentrated amongst a small group of shareholders:

Except as otherwise indicated in the table below, addresses of named beneficial owners are c/o Grace Therapeutics Inc., 2 Tower Center Boulevard, Suite 1101G, East Brunswick, NJ 08816.

| | Total Number of Class A Shares Beneficially Owned | Percentage of Class A Common Stock Beneficially Owned |
|---|---|---|
| **5% or Greater Stockholders:** | | |
| Rajitha Grace 2018 Irrevocable Trust[1] | 6,600,000 | 33.0% |
| Kavuru 2017 Grace Therapeutics LLC Irrevocable Family Trust[2] | 3,600,000 | 18.0% |
| Shore Pharma LLC[3] | 3,329,000 | 16.6% |
| S. George Kottayil | 2,950,000 | 14.8% |
| SS Pharma LLC[4] | 2,200,000 | 11.0% |
| Kottayil Grace Pharma LLC[5] | 1,050,000 | 5.3% |
| **Executive Officers and Directors:** | | |
| Vimal Kavuru | 3,329,000 | 16.6% |
| Subha Thogarchedu | 2,200,000 | 11.0% |
| S. George Kottayil | 4,000,000 | 20.1% |
| All current executive officers and directors as a group (three persons) | 9,529,000 | 47.7% |

The trustee of the Rajitha Grace 2018 Irrevocable Trust was Swami Sambamurty; the trustee of the Kavuru 2017 Grace Therapeutics LLC Irrevocable Family Trust was Sudha Kavuru; and the remaining shareholder entities' sole members were Grace insiders.

33.     Accordingly, because the Merger and Exchange Ratio contemplated then-existing Grace stockholders owning up to 45% of the combined post-close company, following the Merger, if the then-existing Grace stockholders were to act as a group, they could exert substantial control over the outcome of all matters submitted to the Company's shareholders for approval. And, indeed, to this point, in connection with the execution of the Merger Agreement, Acasti entered

into voting agreements with certain Grace stockholders who owned in the aggregate approximately **_98%_** of the outstanding shares of Grace Class A common stock as of June 30, 2021, which strongly suggested that nearly all of Grace's stockholders act in near unison. As a result, while all then-Acasti shareholders were nominally maintaining 55% control of the combined Company's stock, it appears that Grace shareholders would actually form a *de facto* 45% control block.

34.     On August 26, 2021, Acasti shareholders approved the Merger. Notably, despite the fact that (a) there were 208,375,549 outstanding shares of Acasti common stock entitled to vote on the Merger, (b) only 79,679,548 shares were actually present or represented, representing just 36.32% of all outstanding shares, and (c) even worse, *only 21,915,935 shares were actually cast in favor of the Merger – such that the Merger was approved by a mere 10.5% of all outstanding shares.*[1] What is more, Acasti's directors and executive officers cumulatively held approximately 3.9% of Acasti's outstanding shares, and the Proxy represented that Acasti expected those directors and executive officers to vote their shares in favor of the Merger. That means excluding these directors and executive officers, who were expected to vote in favor of the Merger, *only 6.6% of the Company's non-insider, total outstanding shares voted in favor of the Merger.*

35.     The Merger closed on August 27, 2021. After giving effect to the adjustments provided in the Merger Agreement based on each company's capitalization and net cash balances, a total of 145,929,867 common shares of Acasti were issued to Grace stockholders as

---

[1]     This bizarre outcome is the result of Acasti's quorum and voting rules, pursuant to which a mere 33.33% of outstanding shares need be present to form a quorum; all common shares represented at an annual or special meeting, including broker non-votes and Acasti common shares that are represented but that abstain from voting, are treated as present and entitled to vote for purposes of determining the presence or absence of a quorum; and the approval of the Merger required just the affirmative vote of a majority of the votes cast on it at the special meeting.

consideration for the acquisition, bringing the total number of Acasti common shares issued and outstanding to 354,305,416 (prior to the reverse stock split referenced in the Proxy).

### III.  THE PROXY MADE FALSE AND MISLEADING STATEMENTS CONCERNING GRACE'S PROJECTIONS AND VALUATION

36.     On July 15, 2021, Defendants solicited Acasti shareholders to vote in favor of the Merger by filing the Proxy containing false and misleading statements concerning Grace's projections, prospects, and value. The Proxy, which recommended that Acasti shareholders vote in favor of the Merger based upon the fairness of the terms of the Merger, omitted and misrepresented material information about the intrinsic value of Grace and the combined company, misleading shareholders to vote in favor of the Merger without access to material information that was necessary for them cast a fully informed vote.

37.     Defendants, as directors and/or officers of the Company, had a duty to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, as set forth herein, Defendants breached that duty and were therefore negligent, as the omission of the Grace Projections and the fact that Acasti management adjusted the Grace Management Projections upwards rendered specific portions of the Proxy misleadingly incomplete.

38.     Information relating to the financial condition, solvency, and profitability of a company is plainly material to its shareholders. Here, the Proxy made conflicting and misleadingly incomplete statements regarding Grace's valuation and projections.

39.     Critically, the Proxy entirely omitted the Grace Management Projections, the Adjusted Grace Projections, including ten years of cash flow projections,[2] and the details

---

[2]     Free cash flow projections are the single most important financial metric when valuing a company. For this reason, the disclosure of cash flow projections is a staple in the vast majority of

concerning the nature of the adjustments that Acasti management made to the Grace Management Projections, such as the fact that Acasti meaningfully increased the Grace Management Projections.

40.     The Proxy makes numerous references to the Grace Projections and valuations of Grace, demonstrating their importance (and hence materiality) to the Board's decision to approve and recommend the Merger to Acasti shareholders:

a) The Board's recommendation in favor of the Merger anticipated certain benefits of the Merger, those "anticipated benefits assume a successful integration *and are based on projections*…." Proxy at 40.

b) Acasti's board of directors considered the financial analyses of Oppenheimer, including its opinion to Acasti's board (in its capacity as such) as to the fairness to Acasti, from a financial point of view and as of the date of the opinion, of the equity exchange ratio, as more fully described below under the caption "The Merger—Opinion of Acasti's Financial Advisor." Proxy at 105.

c) In connection with its fairness opinion, Oppenheimer specifically reviewed, analyzed, and relied upon among other things, "financial forecasts and estimates related to Grace prepared by the management of Grace, as *adjusted by management of Acasti* and approved for Oppenheimer's use by Acasti. Proxy at 107.

d) "With respect to the Projections, Oppenheimer assumed, *at the direction of Acasti management and with Acasti's consent*, without independent verification or investigation, that those forecasts and estimates were reasonably prepared on bases reflecting the best available information, estimates and judgments of Grace, *as adjusted by Acasti management*, as to Grace's future financial condition and operating results." Proxy at 108.

e) "Oppenheimer assumed, *based on discussions with Acasti management*, that the Projections provided a reasonable basis upon which Oppenheimer could form its opinion and Oppenheimer expressed no view as to any such information or the assumptions or bases therefor. Oppenheimer relied on all such information without independent verification or analysis and did not in any respect assume

---

proxy statements filed by publicly traded companies in connection with mergers.  In fact, in Acasti's most recent 10-K, Defendants acknowledge the importance of cash flows, referencing them 23 times throughout the filing. However, here, Defendants conspicuously withheld any form of Grace's after-tax cash flow projections from Company shareholders – despite the fact that the Board specifically relied on these projections in recommending the Merger and Oppenheimer specifically relied on these projections in performing its financial analyses in favor of the Merger.

any responsibility or liability for the accuracy or completeness thereof." Proxy at 108.

f)   "[T]he Acasti board considered that a reverse merger transaction could provide Acasti shareholders with a meaningful stake in a combined company possessing potentially promising clinical prospects and the means to pursue them, establishing the opportunity for long-term value creation for Acasti shareholders." Proxy at 95.

g)   Recommending the Merger "[b]ased in part on the scientific diligence and analysis of Grace's product pipeline, the potential market opportunity for its products and the expertise of its scientific team, Acasti's board of directors believes that Grace's product candidates have the potential to meet unmet medical needs that currently exist and address a sizable market opportunity, thereby creating value for the shareholders of the combined organization and an opportunity for Acasti shareholders to participate in the potential growth of the combined organization." Proxy at 104.

h)   Recommending the Merger based, in part, on "Acasti's board…review[ of] its assessment of Grace's drug development capabilities and technologies with Acasti's management. Based in part on this analysis, Acasti's board of directors believes that Grace has the potential to develop multiple new therapies using its drug formulation expertise and applying its platform drug delivery technologies that would broaden Acasti's pipeline, which in turn may reduce the risk to the combined organization and its shareholders that one or more of its product candidates is not commercialized." Proxy at 104.

i)   Recommending the Merger based, in part, on "Acasti's board consider[ation of] the strength of the balance sheet and sufficiency of the expected cash resources of the combined organization." Proxy at 104.

j)   Recommending the Merger based, in part, on "Acasti's board…review[] with Acasti's management [of] the current operating plans of Grace to confirm the likelihood that the combined organization would possess sufficient financial resources to allow the management team to focus on implementing Grace's business plan and growing Grace's business. Acasti's board also considered the ability of Grace to take advantage of the potential benefits resulting from becoming a part of a public reporting company listed on Nasdaq should the combined company be required to raise additional equity or debt in the future." Proxy at 104.

41.   As noted above, not only did Defendants review the Grace Projections in their analysis of whether to engage in the Merger, but Acasti's management made adjustments to those projections that Defendants then approved for use by Oppenheimer to perform the valuation

analyses underlying its fairness opinion. And from those projections "prepared by the management of Grace, as adjusted by management of Acasti and approved for Oppenheimer's use by Acasti," Oppenheimer centered their valuation around the cash flow projections in its Discounted Cash Flow ("DCF") analysis.

42.     A DCF analysis is routinely performed in valuing merger transactions and is considered the most important financial analysis because well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows.[3] Here, Oppenheimer agreed, utilizing that metric in performing its DCF analysis, which found substantial value for Grace—up to $227.5 million.

43.     However, statements made elsewhere in the Proxy run counter to this finding, and undercut the validity of these valuations, creating confusion and misleading shareholders. In fact, in the section of the Proxy discussing "*GRACE BUSINESS*"[4] statements go so far to say that Grace was "*unable to predict* when, if ever, we will generate revenue and material net cash inflows from the commercialization and sale of any of our product candidates for which we may obtain marketing approval." Proxy at 188. And two pages later, the Proxy stated: "Because of the numerous risks and uncertainties associated with product development, we are *unable to predict*

---

[3]     Cornelius J. Casey and Norman J. Bartczak, *Cash Flow—It's Not the Bottom Line*, Harvard Bus. Rev. (1984) ("A growing number of securities analysts, financial writers, and accounting policymakers contend that financial statements providing information of a company's cash flows yield a better measure of operating performance than do the company's income statement and balance sheet. According to recent surveys, corporate and government officials have accepted this view; they rated cash flow data the most important piece of information contained in published financial statements. The trend toward wider acceptance of this yard-stick has been building since the early 1970s. Accelerating the trend have been several developments … that put greater distance between a company's net income and its cash flow.") (emphasis added).

[4]     This section of the Proxy was of great concern to Acasti shareholders considering (i) that Grace's business would form the substantial portion of the combined company's business; and (ii) Grace was a private company with virtually no public disclosures about its business, financial condition, or financial projections.

the timing or amount of increased expenses or when or if we will be able to achieve or maintain profitability." Proxy at 190.

44.     As an initial matter, these two statements are facially false and misleading. While it may be true that Grace could not know for certain the timing of future revenues, costs, or cash flows, it is patently untrue that they could not predict the timing of future revenues, costs, or cash flows. This falsity is evinced by the 10 years of cash flow projections created by Grace management, provided to Acasti, adjusted by Acasti management, reviewed by the Acasti Board, approved for Oppenheimer's use, and used by Oppenheimer to support its fairness opinion, which was misleadingly summarized and presented to shareholders to obtain their approval of the Merger. Indeed, the Proxy failed to disclose that the Adjusted Grace Projections—those Oppenheimer's valuations and fairness opinion were predicated on—were unreasonably adjusted upward by Acasti management, thereby making Grace appear more valuable than it actually was and the Merger appear fair to Acasti shareholders when it was not.

45.     Moreover, the overwhelmingly negative tone of the state of Grace's financial condition (see Proxy at 188-190), contradicts the finding of substantial value by Oppenheimer's DCF analysis utilizing the Adjusted Grace Projections. The contrast between these two sets of statements evinces that the adjustments made to the Grace Management Projections by Acasti management and not the Grace Management Projections themselves provided the substantial value to the DCF analysis. In other words, that Acasti management (as approved for use in the valuation analyses by Defendants) significantly adjusted the value of Grace upwards prior to the receipt of the fairness opinion, which made the Merger look more favorable to Acasti shareholders than it would have otherwise.

46.     And other statements in the Proxy confirm this upward adjustment. For example,

Acasti quadrupled the total addressable market for GTX-101 from $400 million to $1.6 billion by

expanding its target indication from Postherpetic Neuralgia ("PHN") pain to include *non-PHN*

pain. This adjustment was made by Acasti and goes against the historical indications for GTX-101

stated by Grace. Moreover, this adjustment would make GTX-101 by far the most widespread and

potentially profitable drug candidate in the Grace pipeline. By comparison, the total addressable

market for GTX-102 is only $150 million and the total addressable market for GTX-104 is only

$300 million.

47.     Further, this shift in indication from strictly PHN pain to include *non-PHN* pain

was so extreme that it caused changes to the plans for the commercialization of GTX-101:

> Although we intend to establish a small, focused, specialty sales and marketing
> organization to promote GTX104 and GTX102 if approved for marketing in the
> United States, we currently have no such organization and the cost of establishing
> and maintaining such an organization may exceed the benefit of doing so. *Given
> the size of its potential market, we anticipate that in order to commercialize GTX
> 101, we would seek to enter into a strategic partnership with a larger marketing
> partner*, if GTX 101 is approved by the FDA for marketing and we may not be
> successful in doing so.
>
>      . . .
>
> **Overall Commercialization Strategy**
>
> Upon consummation of the merger, and once necessary approvals are granted,
> Grace plans to retain its worldwide commercialization rights for some of its key
> product candidates, while for other product candidates it might consider
> collaboration opportunities to maximize market penetration and returns. Acasti
> expects to build a small and focused commercial organization in the U.S. to market
> and sell GTX-104 and GTX-102 upon approval. Grace believes the patient
> populations and medical specialists for these indications are sufficiently
> concentrated to allow it to cost-effectively promote these products following
> approval for commercial sale. *Given that GTX-101 will be targeted to a larger
> primary care and pain specialist market, it is likely Grace will seek commercial
> partnerships to fully exploit the market potential of this drug*.

Proxy at 47, 178 (emphasis in italics added).

48.     Given the level of specificity in the changes of the total addressable market, the

17

divergence from Grace's historical practices, and the detailed plans to change the way GTX-101 will be commercialized compared to the other product candidates, this drastic increase to GTX-101's total addressable market was accounted for or incorporated into the adjustments made by Acasti management to the Grace Management Projections.

49.     GTX-101 (like all of Grace's clinical drug candidates) is an orphan drug candidate that serves as a topical bioadhesive film-forming bupivacaine spray to relieve pain associated with Postherpetic Neuralgia (PHN)—a persistent condition often causes debilitating pain following infection by the shingles virus. Grace received orphan designation for GTX-101, under the generic name bupivacaine hydrochloride, from the FDA on May 31, 2016, exclusively for the treatment of pain associated with PHN. In fact, prior to the announcement of the Merger, Grace never discussed ***non-*PHN** pain as an indicated use of GTX-101 and the only clinical studies in progress for GTX-101 have an exclusive indication for PHN pain.

50.     Further, the source Acasti repeatedly relied on for the notion that non-PHN pain is even a potential indication for GTX-101 (much less a $1.2 billion market increase) is a study that Acasti commissioned from Fletcher Spaght. And the fact that Acasti commissioned this study is, itself, omitted from the Proxy, which simply states: "According to Fletcher Spaght the total addressable market for GTX-101 is $1.6 billion consisting of $400 million for PHN pain and $1.2 billion for non-PHN pain." Proxy at 175. In other words, Acasti, not Grace, is responsible for the substantial increase to the financial outlook of GTX-101, which if widened from its current PHN pain indication to non-PHN pain indication, would mark the first non-orphan drug candidate in Grace's history.

51.     Grace's management team had unique insight into the Company's drug candidates that Acasti's management lacked. The Board was fully aware of the expertise of Grace's

management team when it came to assessing Grace's financial future and the prospects for Grace's products. Indeed, the Proxy notes that the Board considered the strength of Grace's management and scientific team, and their expertise in the biotechnology industry and in the fields of novel drug delivery technology and rare disease, and that Grace's management team possesses significant experience in drug delivery research and evaluation, clinical development, regulatory affairs, and business development.

52.     The failure to disclose the fact that the Grace Management Projections were adjusted upwards by Acasti—or even disclose the Grace Projections so Acasti shareholders could see the sizeable adjustment for themselves—is a material omission that renders multiple statements in the Proxy misleading.

53.     *First*, the following statements describing Acasti's adjustments to the Grace Management Projections were rendered misleading by failing to quantify or explain the nature of the upward adjustments:

A.     "In connection with the opinion, Oppenheimer reviewed, analyzed and relied upon information and material bearing upon the financial and operating condition of Acasti and the merger, including, among other things: . . . financial forecasts and estimates related to Grace prepared by the management of Grace, *as adjusted by management of Acasti* and approved for Oppenheimer's use by Acasti (which we refer to as the "Projections");" Proxy at 107; and

B.     "With respect to the Projections, Oppenheimer assumed, at the direction of Acasti management and with Acasti's consent, without independent verification or investigation, that those forecasts and estimates were reasonably prepared on bases reflecting the best available information, estimates and judgments of Grace, *as*

*adjusted by Acasti management*, as to Grace's future financial condition and operating results." Proxy at proxy at 108.

54.     The Defendants knew the material nature of the adjustments Acasti management made the Grace Management Projections and knew or should have known the impact those misleadingly incomplete statements could have on Acasti shareholders in evaluating the fairness of the Merger. Simply put, reasonable shareholders would have found it important to know that Acasti meaningfully altered the Grace Management Projections—a decision directly contradicting the best estimates of Grace management as to their own company's value—resulting in a higher valuation for Grace in the Proxy. Therefore, the omission of this material information rendered the above statements misleading.

55.     ***Second***, the omission of the nature of the Adjustments and the Grace Projections rendered the "summary" of Oppenheimer's "Discounted Cash Flow Analysis" on page 111 of the Proxy misleading.

56.     The results of the analysis show that the Grace was purportedly worth up to $227.5 million, or approximately 86% of the equity value of the combined company. However, this analysis and its stated valuation is misleadingly tainted by the upward adjustments Acasti management made to the Grace Management Projections. Without disclosing that Acasti management adjusted the Grace Management Projections upwards, or the actual sets of Grace Projections, Acasti shareholders were unable to see the inflation of Grace's value that differed from the best estimates of Grace's own management.

57.     Indeed, in the Proxy, Oppenheimer specifically warned that "its analyses and the summary of its analyses must be considered *as a whole* and that selecting portions of its analyses and factors or focusing on the information presented below in tabular format, without considering

all analyses ***and factors*** or the full narrative description of the financial analyses, including the methodologies ***and assumptions underlying the analyses***, *could create a misleading or incomplete view of the process underlying its analyses and opinion*." Proxy at 109. Despite this explicit warning, the Proxy withheld the single most important "factor[]" and "assumption[]."

58.     By withholding the material fact of the upward adjustments and the actual sets of Grace Projections, the Proxy obfuscated Grace's value and Oppenheimer's financial analyses.

59.     Simply stated, the Defendants allowed the Proxy to incompletely and misleadingly refer to the "adjustments" made to the Grace Management Projections while omitting the fact that the adjustment was a meaningful upward adjustment, and then allowed the Proxy to summarize Oppenheimer's valuation analyses predicated on the unreasonably upward Adjusted Grace Projections, which misled Acasti shareholders about Grace's true value and the fairness of the Merger. The summary of Oppenheimer's DCF Analysis on page 111 of the Proxy was materially incomplete and misleading because it failed to disclose the key facts and metrics that were necessary for shareholders to fully recognize: (i) the illegitimacy of the analyses, *i.e.*, that the Grace Management Projections had been meaningfully and unjustifiably upward adjusted by Acasti; and (ii) how off-base the misleading resulting implied equity value was.

## III.     THE MISLEADING PROXY, WHICH WAS AN ESSENTIAL LINK TO EFFECTUATE THE UNFAIR MERGER, CAUSED PLAINTIFF AND THE CLASS ECONOMIC LOSS

60.     The omissions of the Grace Projections, and the nature of the upward adjustments Acasti management made to the Grace Management Projections, were material because they bore directly on the singular most important consideration to shareholders voting on a merger transaction – the value of the Merger itself. The misrepresentations are all the more egregious in light of the facts that (a) that members of the Board and management conducted concurrent communications during the negotiations that resulted in the Merger Agreement and secured post-

close directorships for themselves in connection therewith and (b) the Board evaluated and ultimately rejected multiple other offers that may have led to no personal benefits for its members.

61.     As a result of the foregoing omissions and materially misleading statements, Plaintiff and all other pre-Merger Acasti shareholders were harmed, in that they approved an unfair Merger. Indeed, under a Selected Public Company Analysis, Acasti's equity value represented as much as 74% of the combined company's equity value, and under a Selected Transactions Analysis it represented as much as 67% of the combined company equity value, yet pre-Merger Acasti shareholders ended up with a significantly smaller ownership stake of approximately 58.7%.

62.     Moreover, the market has recognized the unfairness of the Merger to pre-Merger Acasti shareholders, as the Company's stock price declined continuously and significantly from $3.76 at the close of the market on August 25, 2021 (the day before the misled approval of the Merger) to $2.22 at the close of the market on September 8, 2021. Since that time the stock price of Acasti has continued to fall precipitously to $1.12 as of the drafting of this pleading on February 3, 2022. The collapse of the Acasti stock price was caused by the completion of the Merger (which was approved by Acasti shareholders as a result of the Proxy's misrepresentations regarding the Grace Projections and valuation) as no other negative news or events regarding the companies occurred during that time period. As evinced by the chart below, the price decline was contemporaneous with the uninformed stockholder vote to approve the Merger:



63.     In sum, the omission of the Grace Projections and the fact that Acasti management adjusted the Grace Projections upward misled Acasti shareholders as to the valuation of Grace and the purported fairness of the Merger. The materially misleading Proxy was an essential link in accomplishing the unfair Merger, as the Merger could not have been approved or completed without the consent of Acasti common shareholders. The approval of the unfair Merger caused Acasti shareholders to lose money. Therefore, the omissions and misleading statements in the Proxy were the proximate cause of the financial loss Plaintiff and the Class have suffered since the Merger's consummation - amounting to a loss, as of this pleading, of at least $2.64 per share.

//

## CLASS ACTION ALLEGATIONS

64.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other pre-Merger public shareholders of Acasti harmed by Defendants' actions alleged herein (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

65.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. As of July 14, 2021 (the record date for the shareholder vote on the Merger), there were approximately 208,375,549 outstanding shares of Acasti common stock entitled to vote on the Merger. The actual number of public shareholders of Acasti will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants have misrepresented or omitted material information in the Proxy in violation of Section 14(a) of the Exchange Act;

ii)     whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iii)     the amount of damages the Class has suffered as a result of Defendants' unlawful conduct.

c.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the

interests of the Class;

        d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

        e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

        f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

        g.      A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## CAUSES OF ACTION

### COUNT I

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to

section 78l of this title." 15 U.S.C. § 78n(a)(1).

68.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

69.     Defendants issued the Proxy with the intention of soliciting the Company's public common stockholders' support for the Merger. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which failed to provide critical information regarding, *inter alia*, the financial analyses and financial projections relied upon by the Board and its financial advisor.

70.     In so doing, Defendants omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

71.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon all of the omitted information identified above in connection with their decision to approve and recommend the Merger. Indeed, the Individual Defendants were privy to and had knowledge of the process leading up to the

signing of the Merger Agreement and preparation and review of the Proxy; the Proxy states that the Board approved the use of the Adjusted Grace Projections by Oppenheimer and considered the fairness opinion provided by Oppenheimer and the assumptions made and matters considered in connection therewith; and the Individual Defendants were further required to review Oppenheimer's analyses in connection with their receipt of the fairness opinion, question Oppenheimer as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there were no material misstatements or omissions. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

72. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation and review of the Proxy.

73. Acasti is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

74. The misrepresentations and omissions in the Proxy were material to Plaintiff and the Class, who were deprived of their right to cast an informed vote and suffered damages. The

omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information available to stockholders.

75.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to obtain stockholder approval of the Merger, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

## COUNT II

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

76.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of Acasti within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

78.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

79.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. As outlined above, much, if not all, of the omitted information identified above was specifically reviewed by the Board prior to voting on the Merger and prior to disseminating the Proxy. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were thus directly involved in preparing this document.

80.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

81.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

82.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.      Awarding Plaintiff and the Class damages sustained as a result of Defendants' wrongdoing, including but not limited to compensatory damages, rescissory damages, and/or quasi-appraisal damages, plus pre-judgment and post-judgment interest;

C.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses;

D.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity, and the federal statutory provisions sued hereunder; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: February 4, 2022

**ADDITIONAL COUNSEL**

**KAHN SWICK & FOTI, LLC**
Michael J. Palestina
Brian C. Mears
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Tel: (504) 455-1400
Fax: (504) 455-1498
Email: michael.palestina@ksfcounsel.com
        brian.mears@ksfcounsel.com

*Attorneys for Plaintiff*

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
Miles D. Schreiner
John W. Baylet
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com
        mschreiner@monteverdelaw.com
        jbaylet@monteverdelaw.com

*Attorneys for Plaintiff and Lead Counsel for the Putative Class*