UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAUDEN BISEL, *Individually and on Behalf of All Others Similarly Situated*,

Plaintiff,

-v.-

ACASTI PHARMA, INC., RODERICK CARTER, JAN D'ALVISE, JOHN CANAN, and DONALD OLDS,

Defendants.

21 Civ. 6051 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Lead plaintiff Michael Castaldo brings this putative class action against Acasti Pharma, Inc. ("Acasti"), and four members of its Board of Directors: Roderick Carter, Jan D'Alvise, John Canan, and Donald Olds (collectively, "Defendants"). In brief, Castaldo alleges that Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder, in connection with the merger (the "Merger") of Acasti and Grace Therapeutics Inc. ("Grace"). Specifically, Castaldo alleges that Defendants omitted financial projections prepared by Grace and the adjustments Acasti made to those projections from the proxy statement Acasti issued in conjunction with the proposed Merger. As such, Castaldo contends that certain statements relying on the projections were misleading, and that Acasti shareholders approved an unfair merger. Defendants have filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), Federal Rule of Civil Procedure 9(b), and the Private

Securities Litigation Reform Act of 1995 (the "PSLRA").  For the reasons that follow, the Court grants Defendants' motion to dismiss in full.

## BACKGROUND[1]

### A.  Factual Background

### 1.  The Leadup to the Merger

Acasti is a biopharmaceutical company that focuses on "the research, development, and commercialization of" prescription drugs made with omega-3 fatty acids.  (SAC ¶ 19).  In September 2020, Acasti began exploring "potential strategic transactions" with other businesses.  (*Id.* at ¶ 21).  This process began when a company identified as "Company A" made a non-binding merger offer to Acasti.  (*Id.*).  After declining this offer, the Acasti Board began a more comprehensive process of identifying similar opportunities.  (*Id.* at ¶ 22).  The Board engaged Oppenheimer, a financial advisor, to assist in this process. (*Id.*).  The Board also determined that a reverse merger was the most realistic strategic transaction.  (*Id.*).

---

[1]     The facts of this Opinion are drawn primarily from the Second Amended Complaint (the "SAC" (Dkt. #25)), which is the operative pleading in this case, and the final Rule 424(b)(3) Prospectus (the "Proxy" (Dkt. #27-1)) filed by Acasti with the Securities and Exchange Commission (the "SEC"), included as Exhibit 1 to the Declaration of Peter A. Stokes in Support of Defendants' Motion to Dismiss (Dkt. #27).  *See Tongue* v. *Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (explaining that on a motion to dismiss, "[t]he Court may ... consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff upon which it relied in bringing the suit" (internal quotation marks omitted)).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #28), and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #46).

In the following months, from approximately September 2020 to January 2021, Oppenheimer began gauging interest from other companies. (SAC ¶ 23). By the end of this period, 18 companies had signed confidentiality agreements with Acasti. (*Id.*). And by the end of October 2020, Acasti had received "written initial indications of interest from 21 companies." (*Id.* at ¶ 24). Ultimately, the Board narrowed this group to four companies — identified as Companies B, C, D, and E — which companies would continue to the next round of review and due diligence. (*Id.* at ¶¶ 24-25; *see also* Proxy at 97-98 (discussing the terms of the non-binding proposals from these companies)).

On January 12, 2021, Grace submitted an initial indication of interest to Oppenheimer. (SAC ¶ 25). Plaintiff notes that "[i]t is unclear from the Proxy whether Grace was included in Oppenheimer's initial outreach[.]" (*Id.*). Prior to the Merger, Grace was a privately-held rare and orphan disease specialty pharmaceutical company "focused on developing and commercializing products using novel drug delivery technologies." (*Id.* at ¶ 20). Specifically, Grace had three "clinical stage assets": GTX-101, GTX-102, and GTX-104, all intended to treat orphan diseases. (*Id.*). The Acasti Board met on January 28 and 30, 2021, and further narrowed the review process to Grace, Company B, and Company C. (*Id.* at ¶ 26; Proxy at 99). Companies D and E were ruled out at this point "for different reasons, including their relatively low valuation of Acasti[.]" (*Id.* (quoting Proxy at 99)). During this same meeting, the Board determined to increase potential Acasti ownership in a merged entity, due to higher Acasti market capitalization and cash position. (*Id.* at ¶ 27). If

successful in such negotiation, the Board agreed the transaction could be
structured as an Acasti acquisition, rather than a reverse merger.  (*Id.*).
Thereafter, the Board "[i]nexplicably" (according to Castaldo) approved a 30-day
exclusivity agreement with Company C to advance negotiations, despite
Company C's proposal contemplating a lower Acasti ownership than the
proposals from Company B and Grace.  (*Id.*).  Company C and Acasti, however,
did not ultimately reach an agreement.  (*Id.*).

Acasti's share price continued to rise, and by February 10, 2021, the
company had a market capitalization of $230 million.  (SAC ¶ 28).  As a result,
the finalist companies — Companies B, C, and Grace — renegotiated the
transaction from a reverse merger to an Acasti acquisition, whereby Acasti
shareholders would hold more than 50% ownership of the merged entity.  (*Id.*).
At this point, the Board directed Oppenheimer to "present non-binding
acquisition proposals" to the finalists.  (*Id.*).

Grace was the only company willing to accept "substantially all of the key
material terms" of Acasti's new proposals.  (SAC ¶ 29).  On February 19, 2021,
Acasti proposed to Grace that Acasti shareholders retain 55% ownership of the
merged entity.  (*Id.*).  The companies then entered into an exclusivity period
from the end of February 2021 to May 6, 2021.  (*Id.*; Proxy at 100-04).  On
May 7, 2021, Acasti and Grace entered into an Agreement and Plan of Merger,
whereby Acasti Pharma U.S. Inc., a wholly-owned subsidiary of Acasti, would
be merged into Grace.  (SAC ¶ 2).

###### 2.      The Proxy Statement and the Consummation of the Merger

On July 15, 2021, Acasti and its Board authorized the filing of a proxy statement with the SEC in order to persuade Acasti shareholders to vote in favor of the proposed merger.  (SAC ¶ 3).  Plaintiff alleges that the Proxy contained false and misleading statements and omitted material information about "the intrinsic value of Grace and the combined company[.]"  (*Id.* at ¶ 36).  Specifically, Plaintiff avers that the Acasti Board failed to disclose to shareholders (i) financial projections prepared by Grace management (the "Projections"); and (ii) "upward adjustments" made to the Projections by Acasti, which adjustments were one factor in the analyses discussed in the fairness opinion issued by Oppenheimer related to the Merger.  (*Id.* at ¶¶ 3, 4, 37; *see also* Proxy at Annex B (full fairness opinion)).  The Projections included ten years of cash flow projections.  (*Id.* at ¶ 39).  The Proxy references the Projections, and the fact that Acasti made adjustments to them, at several points.  (*Id.* at ¶ 40 (citing Proxy at 40, 95, 104, 105, 107, 108)).

Oppenheimer's valuation analyses included a Discounted Cash Flow Analysis (the "DCF") informed by the Projections as adjusted by Acasti.  (SAC ¶ 41; Proxy at 111).  Oppenheimer's DCF analysis "found substantial value for Grace — up to $227.5 million."  (SAC ¶ 42).  But other statements in the Proxy urged caution, and suggested that Grace's prospects were uncertain.  (*Id.* at ¶ 43).  For example, the Proxy noted that Grace was "'*unable to predict* when, if ever, we will generate revenue and material net cash inflows from the commercialization and sale of any of our product candidates for which we may

obtain marketing approval.'"  (*Id.* (quoting Proxy at 188); *see also* Proxy at 190

("Because of the numerous risks and uncertainties associated with product

development, we are unable to predict the timing or amount of increased

expenses or when or if we will be able to achieve or maintain profitability.")).

Plaintiff alleges that the contrast between the finding of substantial value in the

DCF analysis and the more cautious statements in the Proxy necessarily

means that Acasti's upward adjustments to the Projections created the illusion

of substantial value.  (SAC ¶ 45).

Plaintiff alleges that other sections of the Proxy reveal that Acasti made

upward adjustments to the Projections.  As one example, Acasti "quadrupled

the total addressable market for GTX-101" — a Grace product — from $400

million to $1.6 billion by expanding the target indication for the drug.  (SAC

¶ 46).  This led to new commercialization plans for the drug.  (*Id.* at ¶ 47 (citing

Proxy at 47, 178)).  Acasti also commissioned a study conducted by Fletcher

Spaght, a market research firm, to determine the expanded total addressable

market.  (*Id.* at ¶ 50 (citing Proxy at 175); *see also* Proxy at 174 (Fletcher

Spaght chart discussing possible expanded indication for GTX-101)).  Acasti

did not include the fact that it commissioned the study in the Proxy.  (SAC

¶ 50).  Plaintiff summarizes his core allegation as follows:

> Simply stated, the Defendants allowed the Proxy to
> incompletely and misleadingly refer to the
> "adjustments" made to the Grace Management
> Projections while omitting the fact that the adjustment
> was a meaningful upward adjustment, and then allowed
> the Proxy to summarize Oppenheimer's valuation
> analyses predicated on the unreasonably upward
> Adjusted Grace Projections, which misled Acasti

> shareholders about Grace's true value and the fairness of the Merger. The summary of Oppenheimer's DCF Analysis on page 111 of the Proxy was materially incomplete and misleading because it failed to disclose the key facts and metrics that were necessary for shareholders to fully recognize: [i] the illegitimacy of the analyses, *i.e.*, that the Grace Management Projections had been meaningfully and unjustifiably upward adjusted by Acasti; and [ii] how off-base the misleading resulting implied equity value was.

(*Id.* at ¶ 59).

The Acasti shareholder vote on the Merger took place on August 26, 2021. (SAC ¶¶ 5, 34). At the vote, 79,679,548 Acasti shares were present (*id.*), satisfying the company's requirement that a quorum of one-third of the outstanding Acasti shares be present for the vote (Proxy at 8). 21,915,935 were cast in favor of the Merger. (SAC ¶¶ 5, 34). Plaintiff notes that this means that, of the total 208,375,549 outstanding shares eligible to vote on the Merger, only 10.5% were cast in favor of the Merger. (*Id.*). Following this affirmative vote, Acasti announced the close of the Merger on the next day, August 27, 2021. (*Id.* at ¶¶ 5, 35).

### 3. Events Following the Consummation of the Merger

Following the Merger, Grace emerged as the surviving corporate entity, now a wholly-owned subsidiary of Acasti. (SAC ¶ 2). Acasti's pre-Merger shareholders owned approximately 58.8% of the merged entity. (*Id.* at ¶ 6). Grace shareholders, on the other hand, owned the remaining 41.2%. (*Id.*). Plaintiff alleges that Acasti's value represented "as much as 74% of the combined company's equity value," under a selected public company analysis, and "as much as 67% of the combined company equity value" under a selected

transactions analysis. (*Id.* at ¶ 61). Following consummation of the Merger, Acasti's stock price declined from $3.76 per share to $1.12 as of February 3, 2022. (*Id.* at ¶ 62). Plaintiff claims that shareholders have thus lost $2.64 per share as a result of the omissions and misleading statements in the Proxy. (*Id.* at ¶ 63).

## B.     Procedural Background

Plaintiff Lauden Bisel initiated this action by filing a complaint on July 14, 2021. (Dkt. #1). On August 10, 2021, the case was reassigned from the Honorable Alvin K. Hellerstein to this Court. (Notice of Case Reassignment). That same day, Defendants filed a pre-motion letter, discussing a contemplated motion to dismiss the complaint and requesting consolidation of this case with *Castaldo* v. *Acasti Pharma, Inc.*, No. 21 Civ. 6567 (KPF). (Dkt. #6). On August 13, 2021, Bisel filed a pre-motion letter responding to the substance of Defendants' letter and noting that the plaintiffs in the separate actions consented to consolidation of the two cases. (Dkt. #7). On August 16, 2021, the Court entered an Order consolidating this case with *Castaldo*. (Dkt. #8). In this Order, the Court did not administratively close the *Castaldo* case, but all relevant filings for the consolidated cases have been docketed in *Bisel*.

Following consolidation, the Court granted Defendants' request for a pre-motion conference on August 17, 2021. (Dkt. #9). This conference was held on September 1, 2021. (Minute Entry for September 1, 2021). Bisel then filed an amended class action complaint on October 1, 2021. (Dkt. #10). Because

Bisel had filed a class action complaint, the Court ordered, pursuant to the PSLRA, that he inform the Court in writing of the date and manner in which he had published the required notice advising members of the putative class of the pendency of the action. (Dkt. #13 (citing 15 U.S.C. § 78u-4(a)(3)(A)(i)(I))). Bisel filed proof of the requisite notice on October 7, 2021 (Dkt. #14), and the next day the Court ordered members of the purported class to move the Court to serve as lead plaintiffs by December 6, 2021 (Dkt. #15). In this Order, the Court set December 21, 2021, as the deadline for oppositions to any motions for appointment of lead plaintiff, and scheduled a hearing regarding appointment of a lead plaintiff for January 5, 2022. (*Id.*).

On December 6, 2021, Plaintiffs Lauden Bisel and Michael Castaldo (the "BC Group") filed a motion for appointment as lead plaintiffs and supporting papers. (Dkt. #16-19). In their motion, two firms — Monteverde & Associates PC and Kahn Swich & Foti, LLC — requested approval as co-lead counsel. (Dkt. #16). On December 22, 2021, the BC Group filed a notice that no competing lead plaintiffs had filed motions, and that there was no opposition to their appointment. (Dkt. #20). This notice requested adjournment of the previously-scheduled January 5, 2022 hearing. (*Id.*). The Court endorsed this notice on December 29, 2021, but declined to adjourn the January 5, 2022 hearing. (Dkt. #21). That same day, Defendants filed another pre-motion letter, renewing the arguments for dismissal they raised previously and noting that they did not oppose appointment of the BC Group as lead plaintiffs. (Dkt. #22).

On January 5, 2022, the Court held the aforementioned conference to discuss appointment of lead plaintiffs and lead counsel.  (Minute Entry for January 5, 2022).  At that conference, the Court appointed Castaldo to serve as lead plaintiff, and Monteverde & Associates PC to serve as lead counsel.  (Dkt. #23 at 8:6-18).[2]  The Court also set February 4, 2022, as the date for Plaintiff to file a second amended complaint (*id.* at 9:24-10:5), and set forth a briefing schedule for Defendants' motion to dismiss the forthcoming second amended complaint (*id.* at 11:22-12:4).  In line with this schedule, Plaintiff filed the Second Amended Complaint (the "SAC") — the operative complaint in the consolidated class action — on February 4, 2022.  (Dkt. #25).  Defendants filed their motion to dismiss and supporting papers on February 25, 2022.  (Dkt. #26-28).

On March 24, 2022, Plaintiff requested an extension of time to file his opposition to the motion to dismiss.  (Dkt. #29).  The Court then set a revised scheduling order in line with this request on March 25, 2022.  (Dkt. #30). Plaintiff filed a second request for an extension on April 28, 2022, so Plaintiff "could confer with Defendants regarding factual arguments raised in their Motion to Dismiss."  (Dkt. #31).  The Court again entered a revised scheduling order based on this request.  (Dkt. #32).

On May 27, 2022, Monteverde & Associates PC and Kahn Swich & Foti, LLC, filed a motion to withdraw as counsel for Plaintiff and supporting papers.

---

[2]     Henceforth, any references to "Plaintiff" refer to Castaldo, who is the lead plaintiff in this consolidated case.

(Dkt. #33-38).  In the Declaration of Juan E. Monteverde in support of this motion, Plaintiff's counsel noted that, following an exchange of information between Defendants and Plaintiff's counsel, "[c]ounsel no longer believe that they can reasonably oppose the Motion to Dismiss while conforming to their duties as officers of the Court because the [d]ocuments [shared with Plaintiff's counsel] contradict the allegations and theory of the case and in particular paragraph 4 in the complaint." (Dkt. #35 ¶ 8).  This paragraph of the SAC relates to Plaintiff's core allegation that Defendants withheld from shareholders the Projections and the upward adjustments allegedly made to them by Acasti. (SAC ¶ 4).  Also in this Declaration, counsel represented that he had attempted to communicate with Plaintiff regarding the factual misunderstanding, but that Plaintiff had not meaningfully engaged with counsel and instead only noted that he (Plaintiff) wanted more time to review the information.  (Dkt. #35 ¶¶ 9-10).  Plaintiff similarly did not respond to counsel's notice that they intended to withdraw from the case.  (*Id.* at ¶ 12).  Defendants responded to the motion to withdraw by noting that they did not oppose withdrawal, and consented to a 30-day extension of Plaintiff's response deadline.  (Dkt. #39).

On May 31, 2022, the Court entered an Order permitting Plaintiff's counsel to withdraw from the case.  (Dkt. #40).  In the Order, the Court provided Plaintiff 30 days to secure new representation, and set August 1, 2022, as the date for Plaintiff to submit an opposition, and August 15, 2022, as the date for Defendants to file a reply.  (*Id.* at 2).  Following this Order, Plaintiff filed applications to proceed *in forma pauperis* ("IFP") and for the Court to

11

appoint *pro bono* counsel on June 13, 2022.  (Dkt. #42-43).  On June 21, 2022, the Court entered an Order granting Plaintiff's request to proceed IFP (Dkt. #44 at 2), and denying Plaintiff's request for appointment of *pro bono* counsel (*id.* at 3).  Specifically, the Court found that appointment of *pro bono* counsel was inappropriate because Plaintiff's "claims are not likely to be of substance." (*Id.*).  The Court initially noted that Plaintiff's failure to file an opposition brief would result in dismissal of the case without prejudice (*id.* at 4), but revised this assessment in an Order on June 23, 2022 (Dkt. #45 at 1).  Plaintiff did not file an opposition brief by August 1, 2022.  On August 15, 2022, Defendants filed a reply memorandum of law in support of their motion to dismiss.  (Dkt. #46).  Accordingly, the motion to dismiss is ripe for the Court's consideration.

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

"[A]lthough a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law."  *McCall* v. *Pataki*, 232 F.3d 321, 322-23 (2d Cir. 2000).  Accordingly, "the plaintiff's failure to respond to a Rule 12(b)(6) motion does not [itself] warrant dismissal," and the district court must determine whether dismissal of the complaint is appropriate on the merits.  *Id.* at 323.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). The Court is tasked with applying the same standard irrespective of whether a motion to dismiss is unopposed. *See Haas* v. *Com. Bank*, 497 F. Supp. 2d 563, 564 (S.D.N.Y. 2007) ("In deciding an unopposed motion to dismiss, a court is to 'assume the truth of a pleading's factual allegations and test only its legal sufficiency[.]'" (quoting *McCall*, 232 F.3d at 322)); *accord Blanc* v. *Cap. One Bank*, No. 13 Civ. 7209 (NSR), 2015 WL 3919409, at *2-3 (S.D.N.Y. June 24, 2015). While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

### 2. Pleading Requirements for Section 14(a) and Rule 14a-9 Cases

Section 14(a) of the Exchange Act makes it unlawful

> for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the

13

> Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

15 U.S.C. § 78n(a)(1).  Pursuant to this section, the SEC promulgated Rule 14a-9, which specifies that proxy communications may not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. § 240.14a-9(a).

Plaintiff faces a high pleading standard in this case.  *First*, under the PSLRA, which applies to private class actions brought pursuant to Section 14 of the Exchange Act, a complaint alleging violations of Section 14(a) and Rule 14a-9 based on omissions of material facts that make affirmative statements misleading, must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); *see also Furlong Fund LLC* v. *VBI Vaccines, Inc.*, No. 14 Civ. 9435 (SHS), 2016 WL 1181710, at *3 (S.D.N.Y. Mar. 25, 2016) ("The PSLRA's pleading requirements as to misleading statements and omissions apply to Section 14(a) claims sounding in negligence, such as those here."); *In re Bank of Am. Corp. Sec., Derivative, &*

*Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 286 (S.D.N.Y. 2010) ("The PSLRA, for its part, has 'imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act.'" (quoting *Stoneridge Inv. Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008))); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) ("Even if plaintiffs had not brought a Section 14(a) claim sounding in fraud, pursuant to the PSLRA, 15 U.S.C. § 78u-4(b)(1), they would still have had to plead facts indicating why the alleged misrepresentations were misleading."). Thus, where the PSLRA applies, as here, plaintiffs "'must do more than say that the statements ... were false and misleading; they must demonstrate with specificity why and how that is so.'" *Oklahoma Firefighters Pension & Ret. Sys.* v. *Xerox Corp.*, 300 F. Supp. 3d 551, 564 (S.D.N.Y. 2018) (quoting *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004)), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys.* v. *Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) (summary order).

*Second*, Plaintiff is at least partially subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for allegations of fraud, which standard requires that a party "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The SAC does not specifically allege fraud. However, "'[t]here is no requirement in the Second Circuit that plaintiffs allege fraud in order to state a cause of action pursuant to Section 14(a) ... [w]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading

requirements, ... even if they disclaim reliance on a fraud theory.'" *Police & Fire Ret. Sys. of Detroit* v. *SafeNet, Inc.*, 645 F. Supp. 2d 210, 226 (S.D.N.Y. 2009) (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d at 636); *see also Rombach*, 355 F.3d at 171 ("[The] wording [of Rule 9(b)] is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action.").

Plaintiff's SAC alleges Section 14(a) claims partially grounded in fraudulent conduct.  (*See, e.g.*, Compl. ¶ 71 ("The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.")).  Under the PSLRA, therefore, Plaintiff must "'[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent.'" *Rombach*, 355 F.3d at 170 (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)); *see also Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) ("A complaint asserting securities fraud must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) ....  In 1995, Congress enacted the ... PSLRA ... which, among other things, imposed heightened pleading requirements for plaintiffs in securities fraud actions.").[3]

---

[3]     The Court notes that there is substantial overlap between the pleading standards set forth in the PSLRA and Rule 9(b), and that its ultimate disposition of this motion would be the same under either provision.

**B.     Analysis**

**1.     Overview of Plaintiff's Claims**

Plaintiff's Section 14(a) and Rule 14a-9 claim alleges that Defendants "knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading."  (SAC ¶ 71).  In effect, Plaintiff alleges that Defendants were required to disclose the Projections and any adjustments made to them (*see id.* at ¶ 37 ("[T]he omission of the Grace Projections and the fact that Acasti management adjusted the Grace Management Projections upwards rendered specific portions of the Proxy misleadingly incomplete.")), and that Acasti's adjustments to the Projections rendered later statements based on the Projections false or misleading (*see, e.g., id.* at ¶¶ 41 (noting that the adjusted Projections were used to perform Oppenheimer's valuation analysis and the DCF), 58 ("By withholding the material fact of the upward adjustments and the actual sets of Grace Projections, the Proxy obfuscated Grace's value and Oppenheimer's financial analyses.")).

To state a claim under Section 14(a) and Rule 14a-9(a), a plaintiff must allege that: "[i] a proxy statement contained a material misrepresentation or omission, which [ii] caused plaintiffs' injury, and [iii] that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."  *Bond Opportunity Fund* v. *Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004) (summary order); *accord Police & Fire Ret. Sys. of Detroit*, 645 F. Supp. 2d at 226.  In other

words, "both loss causation and transaction causation must be proven ... under § 14(a)." *Grace* v. *Rosenstock*, 228 F.3d 40, 47 (2d Cir. 2000).

"[T]he plain language of Rule 14a-9 requires a plaintiff to show both materiality *and* a false or misleading statement as a result of the omission." *IBEW Local 98 Pension Fund* v. *Cent. Vt. Pub. Serv. Corp.*, No. 11 Civ. 222 (CR), 2012 WL 928402, at *11 (D. Vt. Mar. 19, 2012). "[O]mission of information from a proxy statement will violate these provisions if either the SEC regulations specifically require disclosure of the omitted information in a proxy statement, or the omission makes other statements in the proxy statement materially false or misleading." *Resnik* v. *Swartz*, 303 F.3d 147, 151 (2d Cir. 2002). However, "[d]isclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Id.* at 154; *see also Sodhi* v. *Gentium S.p.A.*, No. 14 Civ. 287 (JPO), 2015 WL 273724, at *5 (S.D.N.Y. Jan. 22, 2015) (a disclosure statement "must contain only a 'fair summary' of the underlying bases for a financial advisor's fairness opinion"); *Hysong* v. *Encore Energy Partners LP*, No. 11 Civ. 781 (SRD), 2011 WL 5509100, at *8 (D. Del. Nov. 10, 2011) ("A plaintiff's desire to know information that may be material ... is not enough to state a claim under Section 14(a) under ordinary pleading requirements. He must point to a statement that is misleading, or is made misleading by operation of a material omission." (footnote omitted)). Courts in the Second Circuit "have consistently held that neither the PSLRA safe harbor, nor the bespeaks-caution doctrine protects material omissions." *Wilson* v. *LSB Indus., Inc.*, No. 15 Civ. 7614 (RA),

2017 WL 7052046, at *3 (S.D.N.Y. Mar. 2, 2017); *see also Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 770 (2d Cir. 2010) ("[C]autionary language that is misleading in light of historical fact cannot be meaningful[.]"); *Iowa Pub. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) ("That allegation specifies an omission of present fact, to which bespeaks caution does not apply[.]").[4]

In order to plead materiality in the context of an omission, a plaintiff must show "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Va. Bankshares, Inc.* v. *Sandberg*, 501 U.S. 1083, 1090 (1991) (citation omitted); *see also TSC Indus., Inc.* v. *Northway, Inc.*, 426 U.S. 438, 449 (1976) ("Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." (citation omitted)); *Resnik*, 303 F.3d at 151.

Plaintiff does not allege that any relevant SEC regulations mandate disclosure of the Projections or adjustments made to the Projections. Accordingly, the Court considers whether Plaintiff has adequately identified a statement that is misleading or made misleading due to a material omission. Plaintiff alleges that Defendants' alleged upward adjustment to the Projections

---

[4]     The PSLRA safe harbor — a codification of the common law "bespeaks caution" doctrine — immunizes a defendant in any private action against liability for federal securities law violations based on "any forward-looking statement, whether written or oral."  15 U.S.C. § 77z-2(c)(1).

"is a material omission that renders multiple statements in the Proxy misleading." (SAC ¶ 52; *see also, e.g.*, *id.* at ¶ 55 ("the omission of the nature of the Adjustments and the Projections rendered the 'summary' of Oppenheimer's 'Discounted Cash Flow Analysis' … misleading")). Plaintiff essentially claims that Defendants either negligently directed the use of the wrong inputs for various analyses that informed the fairness opinion, like the DCF, or that they manipulated the Projections, which manipulation then led to misleading representations in the valuations of Grace, the fairness opinion, and other analyses.

### 2. Omission of the Adjusted Projections Did Not Render Statements in the Proxy False or Misleading[5]

Plaintiff identifies a variety of information included in the Proxy that, he argues, was rendered false or misleading through omission of the adjusted Projections. These include: the Board's recommendation to approve the Merger (SAC ¶ 40(a)), Oppenheimer's fairness opinion of the Merger and the summary of that fairness opinion (*id.* at ¶ 40(c)), and certain analyses included in the fairness opinion, like the DCF (*id.* at ¶¶ 41-42).

*First* and as a threshold matter, without more, the Court need not credit a barebones assertion that Defendants did, in fact, adjust the Projections upwards. *See, e.g.*, *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 542

---

[5] Plaintiff makes allegations in the SAC related to, *inter alia*, prior proposals and engagement with other companies, the prospective board of the merged-firm, then-existing Grace stockholders, and the vote to approve the Merger. (SAC ¶¶ 25, 27, 31, 33, 34). However, he never alleges that these facts relate to any allegedly false or misleading statements contained in the Proxy. Accordingly, the Court addresses only Plaintiff's arguments regarding the Projections.

(S.D.N.Y. 2021) (rejecting plaintiff's unadorned assertions that synergy projections "were revised upward" because plaintiff did not "point to any facts supporting this contention"), *judgment entered*, No. 19 Civ. 3356 (JPC), 2021 WL 5140777 (S.D.N.Y. Nov. 4, 2021); *id.* at 539 ("But while the Amended Complaint does point to the specific statements alleged to be misleading, it does not give the reasons why those claims were misleading beyond the bare speculation that Defendants and [their financial advisor] 'capitulated to [the counter-party's] self-serving estimates of the projected value of the Net Synergies.'"); *Golub* v. *Gigamon Inc.*, 372 F. Supp. 3d 1033, 1052 (N.D. Cal. 2019) (rejecting a claim based on allegedly undisclosed projections where "[t]here [wa]s nothing to suggest that" those projections "were ever created").

But Plaintiff does not identify any facts to support his allegation that the Projections were adjusted upward. The Proxy never states that the Projections were adjusted "upwards." Instead, Plaintiff only identifies general references to the fact that the Projections "as adjusted by Acasti management" informed recommendations, analyses, and the fairness opinion issued by Oppenheimer. (*See, e.g.*, SAC ¶ 53 (citing Proxy at 107, 108)). In constructing his theory that Defendants misleadingly adjusted the Projections upwards, Plaintiff relies on a section of the Proxy, titled "Grace Business," that is replete with cautionary statements issued by Grace. (SAC ¶ 43). In this section, the Proxy notes that Grace was "unable to predict when, if ever, we will generate revenue and material net cash inflows from the commercialization and sale of any of our product candidates for which we may obtain marketing approval" and, further,

that "[b]ecause of the numerous risks and uncertainties associated with product development, we are unable to predict the timing or amount of increased expenses or when or if we will be able to achieve or maintain profitability." (Proxy at 188, 190). Based on these admonitions, Plaintiff concludes that the Projections — which do provide positive, concrete numbers — must therefore have been "unreasonably adjusted upward by Acasti management[.]" (SAC ¶ 44; *see also id.* at ¶ 45).

Even if the Court credits Plaintiff's conclusion that the Projections were adjusted upwards, Plaintiff does not explain why any potential upward adjustments to the Projections would be fraudulent, nor how any opinions rendered based on them would be fraudulent. As discussed above, such a theory is subject to the heightened standards of both Rule 9(b) and the PSLRA. *See, e.g.*, *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 517 (S.D.N.Y. 2019) ("[B]ecause Lead Plaintiff fails to assert that the Executive Officer Defendants' failure to disclose the existence of the standstills was conscious, reckless, or at a bare minimum, had any bearing on the other bidders' ability to bid, a reasonable shareholder would likely not find this omission material.").

Plaintiff makes no specific allegations about who created the allegedly upward-adjusted Projections, nor when they were made. He only points to the statements discussed above, which temper optimism with a healthy dose of caution, to suggest that Defendants made upward adjustments. In a recent case from a sister court in this District, *In re E-House Securities Litigation*, the court found that allegations that the defendants used one set of management

22

projections in a proxy and failed to disclose "more favorable parallel projections" did not contain the requisite "'detail as to the who, what, when, where, and how'" of the parallel projections, such that their omission rendered statements based on the set of projections that were used misleading.  No. 20 Civ. 2943 (ER), 2021 WL 4461777, at *11, 14 (S.D.N.Y. Sept. 29, 2021) (quoting *Long Miao* v. *Fanhua, Inc.*, 442 F. Supp. 3d 774, 803-04 (S.D.N.Y. 2020)).  So too here.  The cautionary language Plaintiff cites — plainly disclosed in the Proxy — does not *ipso facto* support the allegation that Defendants made fraudulent upward adjustments to the Projections with the requisite particularity required by either the PSLRA or Rule 9(b).  Though this section of the Proxy notes the difficulty involved in projecting Grace's future performance, the Proxy also discloses that both Grace and Acasti made projections that informed the fairness opinion and recommendation of the merger, even though such projections were necessarily uncertain.  (Proxy at 108, Annex B-3).

Further, Plaintiff reads this section of the Proxy entirely out of context in order to gin up an inference of malfeasance regarding the adjustments made to the Projections.  The "Grace Business" section of the Proxy spans tens of pages, and explains in detail — albeit urging caution at times — optimistic commercialization plans for Grace's products (Proxy at 165); that Grace's products may be used "to potentially address significant unmet medical needs" (*id.*): and that Grace itself saw commercial opportunities from the merger (*id.* at 178).  Rank speculation that the Board writ large fraudulently inflated the

Projections based on the Proxy's responsible disclosure of uncertainties and risks associated with the Merger and Grace's business does not suffice.

*Second*, even moving past Plaintiff's apparent fraud theory and focusing solely on negligence, "[d]isclosure of an item of information is not required ... simply because it may be relevant or of interest to a reasonable investor." *Resnik*, 303 F.3d at 154. Because of this, "companies may remain silent even with respect to information that a reasonable investor might consider material so long as they do not have an underlying duty to disclose that information." *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018 WL 1725553, at *6 (S.D.N.Y. Mar. 30, 2018) (internal quotation marks and alterations omitted). Only omissions that "make[] other statements in the proxy statement materially false or misleading" can violate the Rule. *Resnik*, 303 F.3d at 151. Again, Plaintiff cites to no rule requiring disclosure of the Projections or the adjustments made to them; thus, the Court analyzes whether the alleged omissions make other statements in the Proxy materially false or misleading.

Courts within this Circuit routinely find that the omission of underlying inputs, assumptions, and financial metrics for the aforementioned types of analyses and opinions, or omission of alternate projections, do not render proxies misleading when there is a fair summary of the underlying bases for the analyses or opinions, even where there are allegations that other projections or inputs could have been used. *See, e.g.*, *Karp* v. *SI Fin. Grp., Inc.*, No. 19 Civ. 199 (MPS), 2020 WL 1891629, at *11 (D. Conn. Apr. 16, 2020) (finding that plaintiff failed to "allege any facts" that "made any statement in

the Proxy misleading," where defendant failed to disclose "financial metrics and assumptions relied on by … the Board's financial advisor [] in developing its fairness opinion"), *appeal withdrawn sub nom. Karp* v. *Bushansky*, No. 20-1625, 2020 WL 4875296 (2d Cir. June 9, 2020); *see also Bemis*, 512 F. Supp. 3d at 542 ("But the existence of some additional, intermediary projection — if one even existed — does not automatically constitute a material fact, the omission of which makes a Proxy misleading."); *Reinhardt* v. *Cortland Bancorp Inc.*, No. 21 Civ. 8460 (MKV), 2021 WL 5013800, at *2 (S.D.N.Y. Oct. 28, 2021) (finding, in context of omitted financial projections used by financial advisor, that omission did not render proxy misleading because "[w]hile the Proxy omits the underlying data, it contains detailed descriptions of the bases for [the financial advisor's analyses]"); *Sodhi*, 2015 WL 273724, at *5 ("[Plaintiff] contends that the [SEC Schedule]14D-9 [statement] was materially misleading because it failed to disclose 'key inputs' into both the DCF and the relative valuations.  But a disclosure statement must contain only a 'fair summary' of the underlying bases for a financial advisor's fairness opinion."); *In re N. Telecom Ltd. Secs. Litig.*, 116 F. Supp. 2d 446, 458 (S.D.N.Y. 2000) ("'The federal securities laws do not obligate companies to disclose their internal forecasts.'" (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir. 1997))).

Plaintiff cannot merely deem that omission of the Projections, or the adjustments made to them, renders other statements in the Proxy misleading. He must explain why disclosure of the fact that adjustments were made to the

Projections, as opposed to disclosure of the Projections or the adjustments, was insufficient.  *See Bemis*, 512 F. Supp at 539 ("[W]hile the Amended Complaint does point to the specific statements alleged to be misleading, it does not give the reasons why those claims were misleading beyond the bare speculation that Defendants … capitulated to … self-serving estimates of the projected value of the Net Synergies." (internal quotation marks omitted); *Karp*, 2020 WL 1891629, at *11 ("The Amended Complaint includes numerous allegations that speak to the usefulness of … metrics [like free cash flow figures, financial projections, assumptions used in forecasts, etc.] and their importance in informing a shareholder's voting decision — that is, their *materiality* — but no non-conclusory allegation that these omissions rendered any statement in the Proxy false or misleading."); *In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17 Civ 162 (RS), 2018 WL 466527, at *4 (N.D. Cal. Jan. 18, 2018) ("For a statement to be false or misleading, it 'must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.'" (quoting *Brody* v. *Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).  And he must do so with the requisite specificity.  *See, e.g.*, *Vardakas* v. *Am. DG Energy Inc.*, No. 17 Civ. 10247 (LTS), 2018 WL 1141360, at *5 (D. Mass. Mar. 2, 2018) ("[Plaintiff] alleges that the summary [of fairness analyses] did not constitute a fair summary, but does not identify how the omission of [the] inputs obscured flaws in the analyst's fairness opinion.  He alleges no facts suggesting that the undisclosed information [regarding the

inputs] is inconsistent with, or otherwise significantly differs from, the disclosed information." (internal citations and quotation marks omitted))).

Here, Plaintiff merely appends the word "misleading" to statements made in the Proxy, and essentially alleges that such statements were required to "quantify or explain the nature of the upward adjustments." (SAC ¶ 53). He then parrots the substance of analyses, opinions, and representations that incorporated the Projections to substantiate his claim that omission of the Projections rendered them misleading. For example, Plaintiff notes that the fairness opinion relied on "among other things ... financial forecasts and estimates related to Grace prepared by the management of Grace, *as adjusted by management of Acasti* and approved for Oppenheimer's use by Acasti[.]" (SAC ¶ 53(A) (quoting Proxy at 107)). And he reiterates the summary section of Oppenheimer's DCF, which found that Grace could be worth up to $227.5 million. (*Id.* at ¶¶ 55-56 (citing Proxy at 111)). But other than making the barebones allegation that such statements were "misleadingly tainted by the upward adjustments" (SAC ¶ 56), Plaintiff does not attempt to explain why the statements were actually misleading. *See, e.g.*, *Karp*, 2020 WL 1891629, at *13 ("[B]y alleging that the omission of cash flow projections or other information made *entire sections* of the proxy ... such as the summary of the financial advisor's Discounted Cash Flow Analysis ... misleading, I cannot agree that such a finding is faithful to the plain language of the PSLRA." (internal citations and parentheticals omitted)).

Plaintiff's allegation that "Grace's value … differed from the best estimates of Grace's own management" is plainly unsupported by statements in the Proxy.  (SAC ¶ 56).  The Proxy not only discusses risk factors related to Grace, but also to Acasti.  (Proxy at 42).  Grace's disclosures about uncertainties in its business says nothing about the company's value.  (*Id.* at 187-90).  And again, these disclosures are coupled with tens of pages of information about Grace's business that gives a more complete picture of the company and its potential.  (*Id.* at 165-86).  Thus, Plaintiff fails to show that the undisclosed Projections would contradict any statements or valuations.

This is not a case in which Defendants disclosed two sets of projections or adjustments to forecasts, and wrongly explained why one set of projections ought to be favored over another.  *See, e.g., In re Hot Topic, Inc. Sec. Litig.*, No. 13 Civ. 2939 (SJO) (JCX), 2014 WL 7499375, at *6 (C.D. Cal. May 2, 2014) (finding that such allegations rendered claim "at least plausible that [d]efendants' changes to [defendant's] financial projections resulted in a less accurate forecast").  Defendants made no direct representations about the adjusted Projections, and instead only noted throughout the Proxy that the Projections formed one data point among myriad others in the fairness opinion, the DCF, and the overall recommendation for the Merger.  The Proxy disclosed the bases for Oppenheimer's fairness opinion and the inputs that informed analyses like the DCF in detailed disclosures.  (*See, e.g.*, Proxy at 106-11).  And it disclosed that Grace made initial Projections, which were adjusted by Acasti.  (*Id.*).  This provided reasonable investors with a "fair summary," *Sodhi*, 2015

WL 273724, at *5 (citation omitted), of the underlying bases for the opinion, the analyses contained in it, and the fact of adjustments to the Projections.  What Plaintiff's allegations instead amount to is a claim for general disclosure of all information within Acasti's possession, which is not required.  Or it is essentially a "quibble" with the inputs and considerations that went into Acasti's valuations, analyses, and opinions.  *See Ridler* v. *Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 989 (D. Minn. 2016) ("Although some courts have found that a faulty valuation analysis resulted in misleading share prices, plaintiffs point to no similar error here.  As stated above, the flaw that plaintiffs point to is simply a 'quibble' with the valuation methodology[.]"); *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 491 (S.D.N.Y. 2004) ("Plaintiffs have not identified any objective facts or data that are misrepresented in the reports.  Furthermore, plaintiffs' efforts to undermine the analysis or models … as false or objectively unreasonable are … refuted on the face of the reports themselves[.]").

*Third*, the representations, analyses, and opinions that Plaintiff identifies as allegedly tainted by the adjusted Projections made clear that they were uncertain and rested on disclosed assumptions.  *See, e.g.*, *Sodhi*, 2015 WL 273724, at *6 (finding that omission of "specific risk adjustments" did not render statement misleading where statement "explicitly notes that it is *not* a comprehensive discussion of everything [the advisor] did and that it is not a complete description of all analyses performed and factors considered by [the advisor] in connection with its opinion." (internal quotation marks omitted)).

The sections of the Proxy relying on the adjusted Projections explain the variables that were considered, and that such variables led to wide-ranging estimates of Grace's value.  (*See, e.g.*, Proxy at 111 (explaining wide-ranging valuations from DCF); *id.* at 109 ("The preparation of an opinion regarding fairness, from a financial point of view, is a complex analytic process involving various determinations as to appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances.")).  And these sections expressly noted their limitations.  (Proxy at 108 ("All such information was based on numerous variables and assumptions that are inherently uncertain, including, without limitation, factors related to general economic and competitive conditions.  Accordingly, actual results could vary significantly from those set forth in those forecasts, projections and estimates.")).  A reasonable investor would take account of these disclosed limitations.  *Sodhi*, 2015 WL 273724, at *6 (noting that qualifications on analyses were "sufficient to put a reasonable investor on notice that the [statement] does not represent a complete description of all analyses performed").

For all of these reasons, the Court does not find that omission of the Projections rendered statements in the Proxy false or misleading.

### 3.    The Projections and the Adjustments Made to Them Were Not Material

"Beyond being false or misleading, a statement or omission must be material to state a Rule 14a claim."  *Silberstein* v. *Aetna, Inc.*, No. 13 Civ 8759

(AJN), 2015 WL 1424058, at *11 (S.D.N.Y. Mar. 26, 2015).  The inquiry the

Court must undertake when assessing materiality is

> whether the *proxy statement* is misleading in light of the
> total mix of information.  Supreme Court and Second
> Circuit cases are clear that the "total mix" is analyzed
> to determine whether, looking beyond the face of the
> proxy statement, a reasonable shareholder would have
> enough information that any omission from the proxy
> statement would not be misleading.

*Id.* at *12 (citing *TSC Indus.*, 426 U.S. at 449; *United Paperworkers Int'l Union* v.

*Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993)); *see also, e.g., Bemis*, 512

F. Supp. 3d at 543 (finding that, even granting plaintiff's claim that synergies

were "revised upward," "[w]hat was disclosed in the Proxy … was sufficient to

give shareholders the information necessary to making an informed vote on the

[t]ransaction," where proxy included information about assumptions

underlying forecasts, cautioned shareholders to not rely on forecasts, and laid

out "extensive due diligence" that the company conducted); *id.* at 542 ("Plaintiff

has not even alleged sufficient facts allowing a conclusion that the purported

[altered] projections even existed.").

Plaintiff fails to show that the disclosure of the Projections or

adjustments made to them would meaningfully alter the total mix of

information available to investors.  In all, the Proxy spans more than 200

pages.  It includes detailed information about Grace's business and future

plans for the business.  (Proxy at 165-98).  It details Grace's historical financial

performance.  (*Id.* at F-1 to F-54).  It includes the entire fairness opinion (*id.* at

B-1 to B-4), and the results and summaries of its several analyses (*id.* at 106-

112).  *See Bemis*, 512 F. Supp. 3d at 543 (finding information in the proxy "sufficient to give shareholders the information necessary to making an informed vote," where proxy included information about assumptions underlying synergies and calculations showing how board arrived at forecasts, and cautioned shareholders not to rely on forecasts).  And, of course, the Proxy discloses that Acasti made adjustments to the Projections, as noted throughout this Opinion, as well as information that informed such adjustments.  (*See, e.g.*, SAC ¶ 48 (noting that plans regarding GTX-101 informed adjustments to the Projections, which plans were disclosed in the Proxy)).

Plaintiff's references to the use of the adjusted Projections further reveal that the Projections were only one factor among many considered.  This is true for the Acasti Board's overall recommendation.  (*See* Proxy at 104-05 (in context of Acasti's recommendation, noting the "large range of factors" taken into account, including "the scientific diligence and analysis of Grace's product pipeline, the potential market opportunity for its products[,] and the expertise of its scientific team"; the belief that "Grace has the potential to develop multiple new therapies using its drug formulation expertise"; the "strength of the balance sheet and sufficiency of the expected cash resources of the combined organization"; and "the financial analyses of Oppenheimer, including its opinion to Acasti's board").  It is equally true for the fairness opinion.  (*See id.* at 106-07 (explaining that "[i]n connection with the opinion, Oppenheimer reviewed, analyzed, and relied upon information and material bearing upon the financial and operating condition of Acasti and the merger," which includes

nine non-exhaustive enumerated buckets of financial and operating information)).  And it is true for the DCF and other similar financial analyses Oppenheimer performed, including a selected transactions analysis, selected public company analysis, and implied equity exchange ratio range analysis. (*See id.* at 110-11).

Ironically, Plaintiff himself cites to the other analyses contained in the fairness opinion — including the Oppenheimer analysis — to argue that omission of the adjusted Projections rendered Oppenheimer's DCF and fairness opinion misleading.  (Proxy at 109-11; SAC ¶ 61 (discussing these analyses with approval)).  And once again, Plaintiff cherry-picks to try to satisfy his pleading obligations: the selected public company analysis found a range of equity value from 26.38% to 74.45%, while the selected transactions analyses found a range of 20.02% to 67.07%.  (Proxy at 111; *see also* SAC ¶ 61 (discussing only the highest number in the range)).  Thus even homing in on the Oppenheimer fairness opinion, Plaintiff only claims that the Projections informed one analysis: the DCF.  (SAC ¶ 41; *see also* Proxy at 111).  The Proxy does not place any outsized importance on the DCF, nor does the fairness opinion.  In this context, Plaintiff cannot meet his burden where investors had access to a wealth of information from which they could evaluate the merger, and nothing in the Proxy suggests the Projections played a vital role.  And to the extent that Plaintiff argues that other analyses are more accurate because they do not incorporate the Projections, they are consistent with the results of the DCF.  In short, a review of the SAC discloses facts that contradict a finding

that omission of the Projections was material or that such omission altered the total mix of information available to an investor.

Even if this Court were to credit the allegation that the upwardly-adjusted Projections existed, Plaintiff himself explains in the SAC where in the Proxy one could find the information that may have informed any adjustments. That is, in attempting to point out with the requisite specificity how the adjusted Projections were material omissions, Plaintiff points to sections of the Proxy that explain bases for potential adjustment and reflect factors that informed the fairness opinion, recommendations for the merger, and other analyses. This inclusion is the opposite of an omission. As the main evidence that the Projections were adjusted upwards, Plaintiff cites to sections of the Proxy discussing GTX-101, and the possible expanded indication for the drug product that would increase its total addressable market. (SAC ¶¶ 46-47 (citing Proxy at 47, 178)). Possible plans for an expanded indication, as discussed in the Proxy, were informed by a study conducted by Fletcher Spaght, which noted that "'the total addressable market for GTX-101 is $1.6 billion consisting of $400 million for [its current indication] and $1.2 billion for [a possible future indication].'" (SAC ¶ 50 (quoting Proxy at 175); *see also* Proxy at 104 (explaining that "Acasti's board of directors believes that Grace has the potential to develop multiple new therapies using its drug formulation expertise")).[6]

---

[6]     Plaintiff notes in the SAC that Acasti allegedly commissioned this study, and then alleges that "Acasti, not Grace, is responsible for the substantial increase to the financial outlook of GTX-101, which if widened from its current ... indication to [an

Thus, the SAC itself, citing to the Proxy, reveals bases for possible adjustments made to the Projections and other information regarding future plans for the business, and accordingly fails to show a material omission. *See, e.g.*, *City of Taylor Gen. Emps. Ret. Sys.* v. *Magna Int'l Inc.*, 967 F. Supp. 2d 771, 794 (S.D.N.Y. 2013) ("[T]here can be no omission where the allegedly omitted facts are disclosed." (quoting *SRM Global Fund L.P.* v. *Countrywide Fin. Corp.*, No. 09 Civ. 5064 (RMB), 2010 WL 2473595, at *8 (S.D.N.Y. June 17, 2010))); *cf. City of Hialeah Employees' Ret. Sys.* v. *FEI Co.*, 289 F. Supp. 3d 1162, 1176-77 (D. Or. 2018) ("Plaintiff's SAC, in fact, alleges that the company had recently experienced an industry-wide 'downturn.'  Thus, the assumption that the Board's opinion [as to one set of projections] was at least partially based upon — that certain sectors would miss at least some of their goals, as they had historically done — is not unreasonable.").  Even though Plaintiff may disagree with possible expansion plans, Plaintiff concedes that the Proxy included information which may have informed adjustments — information that investors were able to take into account.  (SAC ¶ 48 ("[T]his drastic increase to GTX-101's total addressable market was accounted for or incorporated into the adjustments made by Acasti management to the Grace Management Projections.")).

---

expanded] indication, would mark the first non-orphan drug candidate in Grace's history."  (SAC ¶ 50).  Even crediting this allegation, the study was disclosed in the Proxy as being done by Fletcher Spaght, and investors could take this fact into account.  Plaintiff does not allege that Acasti was required to disclose that it may have commissioned the study.

Accordingly, Plaintiff fails to show that omission of the Projections was material.

### 4. The Challenged Representations Based on the Projections Constitute Statements of Opinion[7]

As noted throughout this Opinion, Plaintiff identifies Oppenheimer's fairness opinion (of which the DCF formed one part (SAC ¶ 55 (citing Proxy at 111))), representations regarding Oppenheimer's analyses (*see, e.g.*, *id.* at ¶ 57 (citing Proxy at 109)), and the Board's recommendation for the Merger (*id.* ¶ 40) as statements rendered false or misleading by omission of the adjusted Projections.  In their briefing, Defendants identify these statements as statements of opinion entitled to the protections for statements of opinion under the securities laws.  The Court agrees.  *See, e.g.*, *Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y.

---

[7]     In their opening brief, Defendants argue that the PSLRA's safe harbor for forward-looking statements — a codification of the common-law "bespeaks caution" doctrine — applies to many of the statements that Plaintiff claims are misleading.  The PSLRA immunizes a defendant in any private action against liability for federal securities law violations based on "any forward-looking statement, whether written or oral." 15 U.S.C. § 77z-2(c)(1).  "'[A] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements."  *In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) (quoting *Iowa Pub. Emps.' Ret. Sys.* v. *MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)).  "The safe harbor provision does not protect companies and their officials from suit when they 'make a materially false or misleading statement about *current or past* facts, and combine that statement with a forward-looking statement.'"  *Hialeah Emps. Ret. Sys.* v. *FEI Co.*, 289 F. Supp. 3d 1162, 1172 (D. Or. 2018) (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017)).

Although the allegedly misleading statements that Plaintiff identifies rely on forward-looking projections, the statements themselves regard the present fairness of the Merger or current estimates of valuations.  For example, though a DCF uses future projections of cash flows as an input (Def. Br. 18), it is meant to estimate the present value of a company.  Thus, the Court does not find that the safe harbor or bespeaks caution doctrine applies here, although it does find the challenged representations, like the fairness opinion and the overall recommendation of the Merger, to be statements of opinion.

May 9, 2003) (noting that fairness opinion is a "statement of opinion"), *aff'd*, 87 F. App'x 772 (2d Cir. 2004) (summary order); *Gray* v. *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 400 (S.D.N.Y. 2020) ("The challenged statements are ones of implied or actual opinion — that management believed the Updated Management Representations, that the Financial Advisors believed that the Updated Management Representations were reasonable, and that the Board believed that the fairness opinions based on the Updated Management Representations were a 'positive factor.'"), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (summary order).  The Court finds this to be an independent basis for dismissal.  *See, e.g.*, *Bemis*, 512 F. Supp. 539-40 ("Even if [p]laintiff had managed to allege an omission, his claim … would fail for another reason: It is a protected statement of opinion.").

"[K]nowingly false statements of reasons may be actionable [under Section 14(a)] even though conclusory in form[.]"  *Va. Bankshares*, 501 U.S. at 1087.  However, "disbelief or undisclosed motivation, standing alone, [is] insufficient to satisfy the element of fact that must be established under § 14(a)."  *Id.* at 1096.  "Plaintiffs who charge that a statement of opinion, including a fairness opinion, is materially misleading, must allege 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false."  *Bond*, 2003 WL 21058251, at *5 (quoting *Va. Bankshares*, 501 U.S. at 1093-98); *see also Fisher* v. *Kanas*, 467 F. Supp. 2d 275, 282 (E.D.N.Y. 2006) (espousing the same test).

Plaintiff fails to plead "with particularity provable facts" that any statements of opinion or recommendations premised on the Projections or adjusted Projections were objectively or subjectively false. *Bond*, 2003 WL 21058251, at *5. For many of the same reasons noted throughout this Opinion, Plaintiff fails to satisfy the objective falsity requirement. As it relates to statements of opinion regarding the accuracy of financial projections, valuations, or other analyses, "for a plaintiff to sufficiently allege that an opinion or financial projection is objectively false, he must allege concrete (and typically quantifiable) facts regarding either past or present performance or valuation that contradict or undermine the opinion." *Montanio* v. *Keurig Green Mountain, Inc.*, 276 F. Supp. 3d 212, 220 (D. Vt. 2017) (collecting cases demonstrating this rule); *Bond*, 2003 WL 21058251, at *7 (finding, in the context of allegation that "appropriate discount rates" were not used for DCF in connection with fairness opinion, that "absent a showing that [investment banker] knowingly used inappropriate rates in order to mislead the shareholders, or incompetently did so, and that the Board was negligent in its failure to discover this lack of care, this allegation cannot support a claim under § 14(a)").

As noted throughout this Opinion, the core fact to which Plaintiff points in order to substantiate his claims that the Projections were wrongly revised upwards concerns the cautionary language contained in the Proxy discussing risks related to Grace's business. (SAC ¶ 45 ("the overwhelmingly negative tone of the state of Grace's financial condition contradicts the finding of substantial

value by Oppenheimer's DCF analysis utilizing the Adjusted Grace Projections"
(citing Proxy at 188-90))).  As the Court previously discussed, these statements
do not contradict statements or opinions based on the Projections, nor do they
prove facts that show that statements and opinions based on the adjusted
Projections were objectively false.  These statements say nothing about the
current valuation of Grace or its potential future value.  Nor do they reveal any
facts regarding the Projections or the adjustments made to them.  Absent such
showing, the Court cannot conclude that statements relying on the adjusted
Projections are objectively false.

Further, Plaintiff alleges no facts to suggest that Defendants believed
their Merger recommendation, Oppenheimer's analyses and fairness opinion,
or any other statement to be false.  Even if Plaintiff showed that there were
"upward" adjustments made to the Projections that rendered statements of
opinion regarding the merger false — which he has not — Plaintiff only cites to
sections of the Proxy that would *confirm* Defendants' belief in the validity of
their statements and opinions.  Again, Plaintiff himself cites to sections of the
Proxy that set forth what Acasti likely considered when making adjustments to
the Projections.  Plaintiff makes only conclusory allegations regarding
Defendants' purported knowledge of alleged falsity, which are not sufficient.
(*See, e.g.*, SAC ¶ 54 ("The Defendants knew the material nature of the
adjustments Acasti management made [to] the Grace Management Projections
and knew or should have known the impact those misleadingly incomplete
statements could have on Acasti shareholders in evaluating the fairness of the

Merger.")).  Such assertions do not come close to what Plaintiff must plead to show subjective falsity.  *See, e.g.*, *Montanio* v. *Keurig Green Mountain, Inc.*, 237 F. Supp. 3d 163, 171 (D. Vt. 2017) ("[T]he complaint must allege 'that [defendants] did not actually hold the belief or opinion stated, and that the opinion stated was in fact incorrect.'" (quoting *Fisher*, 467 F. Supp. 2d at 282 (internal quotation marks omitted)); *see also Baum* v. *Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 87 (D. Conn. 2019) (finding plaintiff adequately alleged subjective falsity where plaintiff specifically identified statements made by CEO that contradicted opinion regarding projections); *In re Analogic Corp. S'holder Litig.*, No. 18 Civ. 11301 (ADB), 2019 WL 4804800, at *12 (D. Mass. Sept. 30, 2019) (noting that plaintiff "must allege particular facts that demonstrate that [d]efendants did not actually believe" the projections they used).

Accordingly, Plaintiff's Section 14(a) and Rule 14a-9 claims similarly fail to meet the standards required to show objectively and subjectively false statements of opinion.

### 5.    Plaintiff's Section 20(a) Claim Fails

Plaintiff's second claim alleges that Defendants Roderick Carter, Jan D'Alvise, John Canan, and Donald Olds (collectively, the "Individual Defendants") violated Section 20(a) of the Exchange Act.  (SAC ¶¶ 77-82).  "To state a claim ... under § 20(a) [of the Exchange Act], 'a plaintiff must show [i] a primary violation by the controlled person, [ii] control of the primary violator by the defendant, and [iii] that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Carpenters Pension*

*Trust Fund of St. Louis* v. *Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014)

(quoting *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir.

2007)).  Specifically, Plaintiff alleges that the Individual Defendants acted as

"controlling persons of Acasti" (SAC ¶ 77), and are thus liable for the "primary

violation" committed by Acasti, namely, the violation of Section 14(a) and Rule

14a-9 discussed above.  However, if a plaintiff has not adequately alleged a

primary violation, *i.e.*, a viable claim under another provision of the Exchange

Act, then the Section 20(a) claims must be dismissed.  *See Carpenters*, 750

F.3d at 236.  Because the Court does not find that Plaintiff has alleged a

primary violation, Plaintiff's Section 20(a) claim is also dismissed.

### 6.    No Sanctions Are Imposed Pursuant to Rule 11(b)

Under the PSLRA, courts are required to make specific findings as to the

compliance by all parties and attorneys with Rule 11(b) of the Federal Rules of

Civil Procedure at the conclusion of all private actions arising under the

Securities Exchange Act of 1934.  15 U.S.C. § 78u-4(c); *ATSI Commc'ns, Inc.* v.

*Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009).  Rule 11(b)(3), in turn,

provides that

> [b]y presenting to the court a pleading ... an attorney ...
> certifies that to the best of the person's knowledge,
> information, and belief, formed after an inquiry
> reasonable under the circumstances, ... the factual
> contentions have evidentiary support or, if specifically
> so identified, will likely have evidentiary support after a
> reasonable opportunity for further investigation or
> discovery[.]

Fed. R. Civ. P. 11(b)(3).  Rule 11 thus imposes on attorneys "an affirmative duty

to conduct a reasonable inquiry into the facts and the law[.]"  *Bus. Guides, Inc.*

v. *Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 551 (1991).  "Since the inquiry must be reasonable under the circumstances, liability for Rule 11 violations requires only a showing of objective unreasonableness on the part of the attorney or client signing the papers."  *ATSI*, 579 F.3d at 150 (citation and internal quotation marks omitted).

The "PSLRA obviates the need to find bad faith prior to the imposition of sanctions."  *ATSI*, 579 F.3d at 152.  Nevertheless, courts must "ensure that any sanctions decision is made with restraint," *Storey* v. *Cello Holdings, LLC*, 347 F.3d 370, 387 (2d Cir. 2003) (internal quotation marks and brackets omitted), as "Rule 11 sanctions are a coercive mechanism, available to trial court judges, to enforce ethical standards upon attorneys appearing before them, while being careful not to rein in zealous advocacy," *Kiobel* v. *Millson*, 592 F.3d 78, 83 (2d Cir. 2010) (internal quotation marks omitted).

Rule 11(b)(3) is violated where "after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact[.]"  *Kropelnicki* v. *Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (internal quotation marks omitted).  "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement," *Kiobel*, 592 F.3d at 83 (citation and quotation marks omitted), and an erroneous statement of fact in a pleading "can give rise to the imposition of sanctions only when the particular allegation is utterly lacking in support," *id.* at 81 (citation and internal quotation marks omitted).  Rule 11(b)(2) requires that "the claims, defenses, and other legal contentions are warranted by existing law or by a

nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).

Although, for the reasons discussed in this Opinion, the Court remains skeptical of Plaintiff's assertion that the Projections were wrongly adjusted upwards after a careful review of the Proxy, and in any event has found that Plaintiff's claims under the Section 14(a) and Rule 14a-9 fail, Plaintiff did not misquote sections of the Proxy or lie to make his case.  To be clear, Plaintiff took wide latitude interpreting sections of the Proxy in order to bring his claims, given the vast amount of information contained therein.  But the Proxy does disclose that adjustments were made to the Projections, even if Plaintiff's theory that they were erroneously adjusted upwards does not make a Section 14(a) or Rule 14a-9 case here.  *Cf. Zagami* v. *Cellceutix Corp.*, No. 15 Civ. 7194 (KPF), 2017 WL 1180923, at *17 (S.D.N.Y. Mar. 29, 2017) ("There is a difference between hair-splitting … and objective unreasonableness.").  Once Plaintiff's counsel determined they could not reasonably defend this Motion to Dismiss, they withdrew.  And though this case did not begin with a *pro se* plaintiff, the Court remains cognizant of the fact that Plaintiff, now proceeding *pro se*, may sincerely hold a different view of this case than his former counsel.  *Cf. Cartwright* v. *D'Alleva*, No. 17 Civ. 5953 (AT) (KHP), 2018 WL 9343524, at *9 (S.D.N.Y. Aug. 27, 2018) ("Although such statements do not give rise to a securities violation, the Court cannot conclude that Plaintiff's filing of claims based on these statements was patently frivolous or unreasonable ….  [A]lthough Plaintiff misconstrued the Individual Defendants' statements … the

43

Court does not find that Plaintiff's allegations about those statements amount to sanctionable conduct, particularly in light of his *pro se* status."), *aff'd*, 782 F. App'x 77 (2d Cir. 2019) (summary order).

Accordingly, the Court does not find that Rule 11 sanctions are warranted in this case.

## CONCLUSION[8]

For the reasons discussed in this Opinion, the Court GRANTS Defendants' motion to dismiss in full.  Further, because Plaintiff has already amended his pleadings twice, and because he has given no indication that he can amend them further to plead viable claims — indeed his former counsel represented to the Court that they could "no longer … reasonably oppose the Motion to Dismiss" (Dkt. #35 ¶ 8) — the Court will not grant leave to amend.

---

[8]     The Court does not address Defendants' other arguments for dismissal, including the Rule 11-compliant pleading arguments raised in their reply or Plaintiff's alleged failure to plead loss causation.  Loss causation "'may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the materialization of a concealed risk that causes a stock price decline.'" *Bricklayers & Masons Loc. Union No. 5 Ohio Pension Fund* v. *Transocean Ltd.*, 866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012) (quoting *In re American Int'l Group, Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010)).  "Whether a loss was caused by an intervening event … is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  *Id.* (internal quotation marks omitted).

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.  The Clerk of Court is further directed to terminate all pending motions, adjourn all remaining dates, and close *Castaldo* v. *Acasti Pharma, Inc.*, No. 21 Civ. 6567 (KPF), which was previously consolidated with this case.

SO ORDERED.

Dated:    September 28, 2022
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge